# CITY OF ROME ET AL. *v.* UNITED STATES ET AL.

No. 78–1840.   Argued October 10, 1979—Decided April 22, 1980

158

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, and STEVENS, JJ., joined. BLACKMUN, J., *post*, p. 187, and STEVENS, J., *post*, p. 190, filed concurring opinions. POWELL, J., filed a dissenting opinion, *post*, p. 193. REHNQUIST, J., filed a dissenting opinion, in which STEWART, J., joined, *post*, p. 206.

*Robert M. Brinson* argued the cause for appellants. With him on the briefs were *William E. Sumner* and *Joseph W. Dorn.*

*Deputy Solicitor General Wallace* argued the cause for appellees. With him on the brief were *Solicitor General McCree, Assistant Attorney General Days, Elinor Hadley Stillman, Brian K. Landsberg, Walter W. Barnett, Mildred M. Matesich,* and *Mark L. Gross.**

MR. JUSTICE MARSHALL delivered the opinion of the Court.

At issue in this case is the constitutionality of the Voting Rights Act of 1965 and its applicability to electoral changes and annexations made by the city of Rome, Ga.

## I

This is a declaratory judgment action brought by appellant city of Rome, a municipality in northwestern Georgia, under the Voting Rights Act of 1965, 79 Stat. 437, as amended, 42 U. S. C. § 1973 *et seq.* In 1970 the city had a population of 30,759, the racial composition of which was 76.6% white and 23.4% Negro. The voting-age population in 1970 was 79.4% white and 20.6% Negro.

The governmental structure of the city is established by a charter enacted in 1918 by the General Assembly of Georgia.

---

*Briefs of *amici curiae* urging reversal were filed by *A. F. Summer,* Attorney General, and *Jerris Leonard* for the State of Mississippi; and by *Ronald A. Zumbrun, John H. Findley,* and *Raymond M. Momboisse* for the Pacific Legal Foundation.

Before the amendments at issue in this case, Rome's city charter provided for a nine-member City Commission and a five-member Board of Education to be elected concurrently on an at-large basis by a plurality of the vote. The city was divided into nine wards, with one city commissioner from each ward to be chosen in the citywide election. There was no residency requirement for Board of Education candidates.

In 1966, the General Assembly of Georgia passed several laws of local application that extensively amended the electoral provisions of the city's charter. These enactments altered the Rome electoral scheme in the following ways:

(1) the number of wards was reduced from nine to three;

(2) each of the nine commissioners would henceforth be elected at-large to one of three numbered posts established within each ward;

(3) each commissioner would be elected by majority rather than plurality vote, and if no candidate for a particular position received a majority, a runoff election would be held between the two candidates who had received the largest number of votes;

(4) the terms of the three commissioners from each ward would be staggered;

(5) the Board of Education was expanded from five to six members;

(6) each Board member would be elected at large, by majority vote, for one of two numbered posts created in each of the three wards, with runoff procedures identical to those applicable to City Commission elections;

(7) Board members would be required to reside in the wards from which they were elected;

(8) the terms of the two members from each ward would be staggered.

Section 5 of the Voting Rights Act of 1965 requires preclearance by the Attorney General or the United States District Court for the District of Columbia of any change in a

"standard, practice, or procedure with respect to voting," 42 U. S. C. § 1973c, made after November 1, 1964, by jurisdictions that fall within the coverage formula set forth in § 4 (b) of the Act, 42 U. S. C. § 1973b (b). In 1965, the Attorney General designated Georgia a covered jurisdiction under the Act, 30 Fed. Reg. 9897, and the municipalities of that State must therefore comply with the preclearance procedure, *United States* v. *Board of Commissioners of Sheffield, Ala.,* 435 U. S. 110 (1978).

It is not disputed that the 1966 changes in Rome's electoral system were within the purview of the Act. *E. g., Allen* v. *State Board of Elections,* 393 U. S. 544 (1969). Nonetheless, the city failed to seek preclearance for them. In addition, the city did not seek preclearance for 60 annexations made between November 1, 1964, and February 10, 1975, even though required to do so because an annexation constitutes a change in a "standard, practice, or procedure with respect to voting" under the Act, *Perkins* v. *Matthews,* 400 U. S. 379 (1971).

In June 1974, the city did submit one annexation to the Attorney General for preclearance. The Attorney General discovered that other annexations had occurred, and, in response to his inquiries, the city submitted all the annexations and the 1966 electoral changes for preclearance. The Attorney General declined to preclear the provisions for majority vote, numbered posts, and staggered terms for City Commission and Board of Education elections, as well as the residency requirement for Board elections. He concluded that in a city such as Rome, in which the population is predominately white and racial bloc voting has been common, these electoral changes would deprive Negro voters of the opportunity to elect a candidate of their choice. The Attorney General also refused to preclear 13 of the 60 annexations in question. He found that the disapproved annexations either contained predominately white populations of significant size

or were near predominately white areas and were zoned for residential subdivision development. Considering these factors in light of Rome's at-large electoral scheme and history of racial bloc voting, he determined that the city had not carried its burden of proving that the annexations would not dilute the Negro vote.

In response to the city's motion for reconsideration, the Attorney General agreed to clear the 13 annexations for School Board elections. He reasoned that his disapproval of the 1966 voting changes had resurrected the pre-existing electoral scheme and that the revivified scheme passed muster under the Act. At the same time, he refused to clear the annexations for City Commission elections because, in his view, the residency requirement for City Commission contained in the pre-existing electoral procedures could have a discriminatory effect.

The city and two of its officials then filed this action, seeking relief from the Act based on a variety of claims. A three-judge court, convened pursuant to 42 U. S. C. §§ 1973b (a) and 1973c, rejected the city's arguments and granted summary judgment for the defendants. 472 F. Supp. 221 (DC 1979). We noted probable jurisdiction, 443 U. S. 914 (1979), and now affirm.

## II

We must first address the appellants' assertion that, for two reasons, this Court may avoid reaching the merits of this action.

## A

The appellants contend that the city may exempt itself from the coverage of the Act. To evaluate this argument, we must examine the provisions of the Act in some detail.

Section 5 of the Act requires that a covered jurisdiction that wishes to enact any "standard, practice, or procedure with respect to voting different from that in force or effect on

November 1, 1964," must seek preclearance from the Attorney General or the United States District Court for the District of Columbia. 79 Stat. 439, as amended, 42 U. S. C. § 1973c.[1]

[1] In its entirety, § 5, as set forth in 42 U. S. C. § 1973c, provides:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title based upon determinations made under the first sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title based upon determinations made under the second sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title based upon determinations made under the third sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b (f) (2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objec-

Section 4 (a) of the Act, 79 Stat. 438, as amended, 42 U. S. C. § 1973b (a),[2] provides that the preclearance requirement of

tion will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to re-examine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 and any appeal shall lie to the Supreme Court."

[2] In its entirety, § 4 (a), as set forth in 42 U. S. C. § 1973b (a), provides:

"To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been made under the first two sentences of subsection (b) of this section or in any political subdivision with respect to which such determinations have been made as a separate unit, unless the United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the seventeen years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color: *Provided,* That no such declaratory judgment shall issue with respect to any plaintiff for a period of seventeen years after the entry of a final judgment of any court of the United States, other than the denial of a declaratory judgment under this section, whether entered prior to or after August 6, 1965, determining that denials or abridgments of the right to vote on account of race or color through the use of such tests or devices have occurred anywhere in the territory of such plaintiff. No citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been made under the third sentence of subsection (b) of this section or in any political subdivision with respect to which such determinations have been made as a separate unit, unless

§ 5 is applicable to "any State" that the Attorney General has determined qualifies under the coverage formula of § 4 (b), 42

---

the United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the ten years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in subsection (f)(2) of this section: *Provided,* That no such declaratory judgment shall issue with respect to any plaintiff for a period of ten years after the entry of a final judgment of any court of the United States, other than the denial of a declaratory judgment under this section, whether entered prior to or after the enactment of this paragraph, determining that denials or abridgments of the right to vote on account of race or color, or in contravention of the guarantees set forth in subsection (f)(2) of this section through the use of tests or devices have occurred anywhere in the territory of such plaintiff.

"An action pursuant to this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 and any appeal shall lie to the Supreme Court. The court shall retain jurisdiction of any action pursuant to this subsection for five years after judgment and shall reopen the action upon motion of the Attorney General alleging that a test or device has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in subsection (f)(2) of this section.

"If the Attorney General determines that he has no reason to believe that any such test or device has been used during the seventeen years preceding the filing of an action under the first sentence of this subsection for the purpose or with the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in subsection (f)(2) of this section, he shall consent to the entry of such judgment.

"If the Attorney General determines that he has no reason to believe that any such test or device has been used during the ten years preceding the filing of an action under the second sentence of this subsection for the purpose or with the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in subsection (f)(2) of this section, he shall consent to the entry of such judgment."

U. S. C. § 1973b (b),[3] and to "any political subdivision with respect to which such determinations have been made as a separate unit." As we have noted, the city of Rome comes within the preclearance requirement because it is a political unit in a covered jurisdiction, the State of Georgia. *United States* v. *Board of Commissioners of Sheffield, Ala.*, 435 U. S. 110 (1978).

---

[3] In its entirety, § 4 (b), as set forth in 42 U. S. C. § 1973b (b), provides:

"The provisions of subsection (a) of this section shall apply in any State or in any political subdivision of a State which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964. On and after August 6, 1970, in addition to any State or political subdivision of a State determined to be subject to subsection (a) of this section pursuant to the previous sentence, the provisions of subsection (a) of this section shall apply in any State or any political subdivision of a State which (i) the Attorney General determines maintained on November 1, 1968, any test or device, and with respect to which (ii) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1968, or that less than 50 per centum of such persons voted in the presidential election of November 1968. On and after August 6, 1975, in addition to any State or political subdivision of a State determined to be subject to subsection (a) of this section pursuant to the previous two sentences, the provisions of subsection (a) of this section shall apply in any State or any political subdivision of a State which (i) the Attorney General determines maintained on November 1, 1972, any test or device, and with respect to which (ii) the Director of the Census determines that less than 50 per centum of the citizens of voting age were registered on November 1, 1972, or that less than 50 per centum of such persons voted in the Presidential election of November 1972.

"A determination or certification of the Attorney General or of the Director of the Census under this section or under section 1973d or 1973k of this title shall not be reviewable in any court and shall be effective upon publication in the Federal Register."

Section 4 (a) also provides, however, a procedure for exemption from the Act. This so-called "bailout" provision allows a covered jurisdiction to escape the preclearance requirement of § 5 by bringing a declaratory judgment action before a three-judge panel of the United States District Court for the District of Columbia and proving that no "test or device" [4] has been used in the jurisdiction "during the seventeen years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color." The District Court refused to allow the city to "bail out" of the Act's coverage, holding that the political units of a covered jurisdiction cannot independently bring a § 4 (a) bailout action. We agree.

In the terms of § 4 (a), the issue turns on whether the city is, for bailout purposes, either a "State with respect to which the determinations have been made under the third sentence of subsection (b) of this section" or a "political subdivision with respect to which such determinations have been made as a separate unit," the "determinations" in each instance being the Attorney General's decision whether the jurisdiction falls within the coverage formula of § 4 (b). On the face of the statute, the city fails to meet the definition for either term, since the coverage formula of § 4 (b) has never been applied to it. Rather, the city comes within the Act because it is part of a covered State. Under the plain language of the statute, then, it appears that any bailout action to exempt the city must be filed by, and seek to exempt all of, the State of Georgia.

---

[4] Section 4 (c) of the Act, as set forth in 42 U. S. C. § 1973b (c), provides:

"The phrase 'test or device' shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class."

The appellants seek to avoid this conclusion by relying on our decision in *United States* v. *Board of Commissioners of Sheffield, Ala., supra.* That decision, however, did not even discuss the bailout process. In *Sheffield,* the Court held that when the Attorney General determines that a State falls within the coverage formula of § 4 (b), any political unit of the State must preclear new voting procedures under § 5 regardless of whether the unit registers voters and therefore would otherwise come within the Act as a "political subdivision." [5] In so holding, the Court necessarily determined that the scope of §§ 4 (a) and 5 is "geographic" or "territorial," 435 U. S., at 120, 126, and thus that, when an entire State is covered, it is irrelevant whether political units of it might otherwise come under § 5 as "political subdivisions." 435 U. S., at 126–129.

*Sheffield,* then, did not hold that cities such as Rome are "political subdivisions" under §§ 4 and 5. Thus, our decision in that case is in no way inconsistent with our conclusion that, under the express statutory language, the city is not a "political subdivision" for purposes of § 4 (a) "bailout."

Nor did *Sheffield* suggest that a municipality in a covered State is itself a "State" for purposes of the § 4 (a) exemption procedure. *Sheffield* held that, based on the structure and purposes of the Act, the legislative history, and the contemporaneous interpretation of the Attorney General, the ambiguities of §§ 4 (a) and 5 should be resolved by holding that § 5's preclearance requirement for electoral changes by a covered "State" reached all such changes made by political units in that State. See 435 U. S., at 117–118. By contrast, in this

---

[5] Section 14 (c) (2) of the Act, as set forth in 42 U. S. C. § 1973*l* (c) (2), provides:

"The term 'political subdivision' shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting."

case the legislative history precludes any argument that § 4 (a)'s bailout procedure, made available to a covered "State," was also implicitly made available to political units in the State. The House Commitee Report stated:

"This opportunity to obtain exemption is afforded only to those States or to those subdivisions as to which the formula has been determined to apply as a separate unit; subdivisions within a State which is covered by the formula are not afforded the opportunity for separate exemption." H. R. Rep. No. 439, 89th Cong., 1st Sess., 14 (1965).

The Senate Committee's majority Report is to the same effect:

"We are also of the view that an entire State covered by the test and device prohibition of section 4 must be able to lift the prohibition if any part of it is to be relieved from the requirements of section 4." S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, p. 16 (1965).

See also *id.*, at 21. Bound by this unambiguous congressional intent, we hold that the city of Rome may not use the bailout procedure of § 4 (a).[6]

---

[6] We also reject the appellants' argument that the majority vote, runoff election, and numbered posts provisions of the city's charter have already been precleared by the Attorney General because in 1968 the State of Georgia submitted, and the Attorney General precleared, a comprehensive Municipal Election Code that is now Title 34A of the Code of Georgia. Both the relevant regulation, 28 CFR § 51.10 (1979), and the decisions of this Court require that the jurisdiction "in some unambiguous and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the Act," *Allen* v. *State Board of Elections,* 393 U. S. 544, 571 (1969), and that the Attorney General be afforded an adequate opportunity to determine the purpose of the electoral changes and whether they will adversely affect minority voting in that jurisdiction, see *United States* v. *Board of Commissioners of Sheffield, Ala.,* 435 U. S. 110, 137–138 (1978). Under this standard, the State's 1968 submission cannot be viewed as a submission of the city's 1966 electoral changes, for, as the District

## B

The appellants next argue that its electoral changes have been precleared because of allegedly tardy action by the Attorney General. On May 21, 1976, the city asked the Attorney General to reconsider his refusal to preclear the electoral changes and the 13 annexations. On July 13, 1976, upon its own accord, the city submitted two additional affidavits. The Attorney General denied the motion to reconsider on August 12, 1976.

Section 5 of the Act provides that the Attorney General must interpose objections to original submissions within 60 days of their filing.[7] If the Attorney General fails to make a timely objection, the voting practices submitted become fully enforceable. By regulation, the Attorney General has provided that requests for reconsideration shall also be decided within 60 days of their receipt. 28 CFR § 51.3 (d) (1979).[8] If in the present case the 60-day period for reconsideration is computed as running continuously from May 24, the date of the initial submission of the reconsideration motion, the period expired before the Attorney General made his August 12 response. In contrast, if the period is measured from July 14,

---

Court noted, the State's submission informed the Attorney General only of "its decision to defer to local charters and ordinances regarding majority voting, runoff elections, and numbered posts," and "did not . . . submit in an 'unambiguous and recordable manner' all municipal charter provisions, as written in 1968 or as amended thereafter, regarding these issues." 472 F. Supp. 221, 233 (DC 1979).

[7] See n. 1, *supra*.

[8] This regulation provides:

"When the Attorney General objects to a submitted change affecting voting, and the submitting authority seeking reconsideration of the objection brings additional information to the attention of the Attorney General, the Attorney General shall decide within 60 days of receipt of a request for reconsideration (provided that he shall have at least 15 days following a conference held at the submitting authority's request) whether to withdraw or to continue his objection."

the date the city supplemented its request, the Attorney General's response was timely.

The timing provisions of both the Act and the regulations are silent on the effect of supplements to requests for reconsideration. We agree with the Attorney General that the purposes of the Act and its implementing regulations would be furthered if the 60-day period provided by 28 CFR § 51.3 (d) were interpreted to commence anew when additional information is supplied by the submitting jurisdiction on its own accord.

The logic of *Georgia* v. *United States,* 411 U. S. 526 (1973), indicates that the Government's approach fully comports with the Act and regulations. In that case, the Court examined a regulation of the Attorney General, 28 CFR § 51.18 (a), that provided that § 5's mandatory 60-day period for consideration of original submissions is tolled whenever the Attorney General finds it necessary to request additional information from the submitting jurisdiction. Under the regulation, the 60-day period commences anew when the jurisdiction in question furnishes the requested information to the Attorney General. The Court upheld the regulation, holding that it was "wholly reasonable and consistent with the Act." 411 U. S., at 541.

*Georgia* v. *United States* stands for the proposition that the purposes of the Act are furthered if, once *all* information relevant to a submission is placed before the Attorney General, the Attorney General is accorded the full 60-day period provided by law in which to make his "difficult and complex" decision, *id.,* at 540. It follows, then, that when the submitting jurisdiction deems its initial submission on a reconsideration motion to be inadequate and decides to supplement it, as the city of Rome did in the present case, the 60-day period under 28 CFR § 51.3 (d) is commenced anew. A contrary ruling would mean that the Attorney General would, in some cases, be unable to give adequate consideration to materials submitted in piecemeal fashion. In such circumstances, the

Attorney General might be able to respond only by denying the reconsideration motion. Such a result would run counter to the purposes of the Act and regulations, since it would penalize submitting jurisdictions that have legitimate reasons to file supplementary materials.[9]

### III

The appellants raise five issues of law in support of their contention that the Act may not properly be applied to the electoral changes and annexations disapproved by the Attorney General.

### A

The District Court found that the disapproved electoral changes and annexations had not been made for any discriminatory purpose, but did have a discriminatory effect. The appellants argue that § 5 of the Act may not be read as prohibiting voting practices that have only a discriminatory effect. The appellants do not dispute that the plain language of § 5 commands that the Attorney General may clear a practice only if it "does not have the purpose *and* will not have the effect of denying or abridging the right to vote on account of race or color." 42 U. S. C. § 1973c (emphasis added). By describing the elements of discriminatory purpose and effect in the conjunctive, Congress plainly intended that a voting practice not be precleared unless *both* discriminatory purpose and effect are absent. Our decisions have consistently interpreted § 5 in this fashion. *Beer* v. *United States,* 425 U. S. 130, 141 (1976); *City of Richmond* v. *United States,* 422 U. S. 358, 372 (1975); *Georgia* v. *United States, supra,* at 538; *Perkins* v. *Matthews,* 400 U. S. 379, 387, 388 (1971). Furthermore, Congress recognized that the Act prohibited both discriminatory purpose and effect when, in 1975, it extended

---

[9] Because of our resolution of this issue, we need not address the Government's contention that the 60-day period provided by 28 CFR § 51.3 (d) is permissive rather than mandatory.

the Act for another seven years. S. Rep. No. 94–295, pp. 15–16 (1975) (hereinafter S. Rep.); H. R. Rep. No. 94–196, pp. 8–9 (1975) (hereinafter H. R. Rep.).

The appellants urge that we abandon this settled interpretation because in their view § 5, to the extent that it prohibits voting changes that have only a discriminatory effect, is unconstitutional. Because the statutory meaning and congressional intent are plain, however, we are required to reject the appellants' suggestion that we engage in a saving construction and avoid the constitutional issues they raise. See, *e. g.,* *NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490, 499–501 (1979); *id.,* at 508–511 (BRENNAN, J., dissenting). Instead, we now turn to their constitutional contentions.

## B

Congress passed the Act under the authority accorded it by the Fifteenth Amendment.[10] The appellants contend that the Act is unconstitutional because it exceeds Congress' power to enforce that Amendment. They claim that § 1 of the Amendment prohibits only purposeful racial discrimination in voting, and that in enforcing that provision pursuant to § 2, Congress may not prohibit voting practices lacking discriminatory intent even if they are discriminatory in effect. We hold that, even if § 1 of the Amendment prohibits only purposeful discrimination,[11] the prior decisions of this Court foreclose any argument that Congress may not, pursuant to § 2, outlaw voting practices that are discriminatory in effect.

---

[10] The Amendment provides:

"Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

"Section 2. The Congress shall have power to enforce this article by appropriate legislation."

[11] For purposes of this case it is unnecessary to examine the various approaches expressed by the Members of the Court in *City of Mobile* v. *Bolden, ante,* p. 55, decided this day.

The appellants are asking us to do nothing less than overrule our decision in *South Carolina* v. *Katzenbach*, 383 U. S. 301 (1966), in which we upheld the constitutionality of the Act. The Court in that case observed that, after making an extensive investigation, Congress had determined that its earlier attempts to remedy the "insidious and pervasive evil" of racial discrimination in voting had failed because of "unremitting and ingenious defiance of the Constitution" in some parts of this country. *Id.*, at 309. Case-by-case adjudication had proved too ponderous a method to remedy voting discrimination, and, when it had produced favorable results, affected jurisdictions often "merely switched to discriminatory devices not covered by the federal decrees." *Id.*, at 314. In response to its determination that "sterner and more elaborate measures" were necessary, *id.*, at 309, Congress adopted the Act, a "complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant," *id.*, at 315.

The Court then turned to the question whether the Fifteenth Amendment empowered Congress to impose the rigors of the Act upon the covered jurisdictions. The Court examined the interplay between the judicial remedy created by § 1 of the Amendment and the legislative authority conferred by § 2:

> "By adding this authorization [in § 2], the Framers indicated that Congress was to be chiefly responsible for implementing the rights created in § 1. 'It is the power of Congress which has been enlarged. Congress is authorized to *enforce* the prohibitions by appropriate legislation. Some legislation is contemplated to make the [Civil War] amendments fully effective.' *Ex parte Virginia,* 100 U. S. 339, 345. Accordingly, in addition to the courts, Congress has full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting." 383 U. S., at 325–326 (emphasis in original).

Congress' authority under § 2 of the Fifteenth Amendment, we held, was no less broad than its authority under the Necessary and Proper Clause, see *McCulloch* v. *Maryland,* 4 Wheat. 316, 421 (1819). This authority, as applied by longstanding precedent to congressional enforcement of the Civil War Amendments, is defined in these terms:

> " 'Whatever legislation is appropriate, that is, adapted to carry out the objects the [Civil War] amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.' *Ex parte Virginia,* 100 U. S. [339,] 345–346." *South Carolina* v. *Katzenbach, supra,* at 327.

Applying this standard, the Court held that the coverage formula of § 4 (b), the ban on the use of literacy tests and related devices, the requirement that new voting rules must be precleared and must lack both discriminatory purpose and effect, and the use of federal examiners were all appropriate methods for Congress to use to enforce the Fifteenth Amendment. 383 U. S., at 329–337.

The Court's treatment in *South Carolina* v. *Katzenbach* of the Act's ban on literacy tests demonstrates that, under the Fifteenth Amendment, Congress may prohibit voting practices that have only a discriminatory effect. The Court had earlier held in *Lassiter* v. *Northampton County Board of Elections,* 360 U. S. 45 (1959), that the use of a literacy test that was fair on its face and was not employed in a discriminatory fashion did not violate § 1 of the Fifteenth Amendment. In upholding the Act's *per se* ban on such tests in *South Carolina* v. *Katzenbach,* the Court found no reason to overrule *Lassiter.* Instead, the Court recognized that the prohibition was an appropriate method of enforcing the Fifteenth Amendment

because for many years most of the covered jurisdictions had imposed such tests to effect voting discrimination and the continued use of even nondiscriminatory, fairly administered literacy tests would "freeze the effect" of past discrimination by allowing white illiterates to remain on the voting rolls while excluding illiterate Negroes. *South Carolina* v. *Katzenbach, supra,* at 334. This holding makes clear that Congress may, under the authority of § 2 of the Fifteenth Amendment, prohibit state action that, though in itself not violative of § 1, perpetuates the effects of past discrimination.

Other decisions of this Court also recognize Congress' broad power to enforce the Civil War Amendments. In *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966), the Court held that legislation enacted under authority of § 5 of the Fourteenth Amendment [12] would be upheld so long as the Court could find that the enactment " 'is plainly adapted to [the] end' " of enforcing the Equal Protection Clause and "is not prohibited by but is consistent with 'the letter and spirit of the constitution,' " regardless of whether the practices outlawed by Congress in themselves violated the Equal Protection Clause. 384 U. S., at 651 (quoting *McCulloch* v. *Maryland, supra,* at 421). The Court stated that, "[c]orrectly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." 384 U. S., at 651. Four years later, in *Oregon* v. *Mitchell,* 400 U. S. 112 (1970), the Court unanimously upheld a provision of the Voting Rights Act Amendments of 1970, Pub. L. 91–285, 84 Stat. 314, imposing a 5-year nationwide ban on literacy tests and similar requirements for registering to vote in state and federal elections. The Court concluded that Congress could rationally have

---

[12] Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

determined that these provisions were appropriate methods of attacking the perpetuation of earlier, purposeful racial discrimination, regardless of whether the practices they prohibited were discriminatory only in effect. See 400 U. S., at 132–133 (opinion of Black, J.); *id.*, at 144–147 (opinion of Douglas, J.); *id.*, at 216–217 (opinion of Harlan, J.); *id.*, at 231–236 (opinion of BRENNAN, WHITE, and MARSHALL, JJ.); *id.*, at 282–284 (opinion of STEWART, J., joined by BURGER, C. J., and BLACKMUN, J.).[13]

It is clear, then, that under § 2 of the Fifteenth Amendment Congress may prohibit practices that in and of themselves do not violate § 1 of the Amendment, so long as the prohibitions attacking racial discrimination in voting are "appropriate," as that term is defined in *McCulloch* v. *Maryland* and *Ex parte Virginia*, 100 U. S. 339 (1880). In the present case, we hold that the Act's ban on electoral changes that are discriminatory in effect is an appropriate method of promoting the purposes of the Fifteenth Amendment, even if it is assumed that § 1 of the Amendment prohibits only intentional discrimination in voting. Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination,[14] it was proper to prohibit changes that have a discriminatory impact. See *South Carolina* v. *Katzenbach,* 383 U. S., at 335; *Oregon* v. *Mitchell,*

---

[13] There was no opinion for the Court in this case. Mr. Justice Douglas expressed the view that the legislation in question was authorized under § 5 of the Fourteenth Amendment. 400 U. S., at 144–147. The other eight Members of the Court believed that the Congress had permissibly acted within the authority provided it by § 2 of the Fifteenth Amendment. 400 U. S., at 132–133 (opinion of Black, J.); *id.,* at 216 (opinion of Harlan, J.); *id.,* at 232–234 (opinion of BRENNAN, WHITE, and MARSHALL, JJ.); *id.,* at 283 (opinion of STEWART, J., joined by BURGER, C. J., and BLACKMUN, J.).

[14] See *South Carolina* v. *Katzenbach,* 383 U. S. 301, 335, and n. 47 (1966) (citing H. R. Rep. No. 439, 89th Cong., 1st Sess., 10–11 (1965); S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, pp. 8, 12 (1965)).

*supra,* at 216 (opinion of Harlan, J.). We find no reason, then, to disturb Congress' considered judgment that banning electoral changes that have a discriminatory impact is an effective method of preventing States from " 'undo[ing] or defeat[ing] the rights recently won' by Negroes." *Beer* v. *United States,* 425 U. S., at 140 (quoting H. R. Rep. No. 91-397, p. 8 (1969)).

## C

The appellants next assert that, even if the Fifteenth Amendment authorized Congress to enact the Voting Rights Act, that legislation violates principles of federalism articulated in *National League of Cities* v. *Usery,* 426 U. S. 833 (1976). This contention necessarily supposes that *National League of Cities* signifies a retreat from our decision in *South Carolina* v. *Katzenbach, supra,* where we rejected the argument that the Act "exceed[s] the powers of Congress and encroach[es] on an area reserved to the States by the Constitution," 383 U. S., at 323, and determined that, "[a]s against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting," *id.,* at 324. To the contrary, we find no inconsistency between these decisions.

In *National League of Cities,* the Court held that federal legislation regulating minimum wages and hours could not constitutionally be extended to employees of state and local governments. The Court determined that the Commerce Clause did not provide Congress the authority to enact legislation "directly displac[ing] the States' freedom to structure integral operations in areas of traditional governmental functions," 426 U. S., at 852, which, it held, included employer-employee relationships in programs traditionally conducted by States, *id.,* at 851-852.

The decision in *National League of Cities* was based solely on an assessment of congressional power under the Commerce Clause, and we explicitly reserved the question "whether different results might obtain if Congress seeks to affect inte-

gral operations of state governments by exercising authority granted it under other sections of the Constitution such as . . . § 5 of the Fourteenth Amendment." *Id.,* at 852, n. 17. The answer to this question came four days later in *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976). That case presented the issue whether, in spite of the Eleventh Amendment, Congress had the authority to bring the States as employers within the coverage of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.,* and to provide that successful plaintiffs could recover retroactive monetary relief. The Court held that this extension of Title VII was an appropriate method of enforcing the Fourteenth Amendment:

> "[W]e think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, . . . are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. In that section Congress is expressly granted authority to enforce 'by appropriate legislation' the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority." *Fitzpatrick* v. *Bitzer, supra,* at 456.

We agree with the court below that *Fitzpatrick* stands for the proposition that principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments "by appropriate legislation." Those Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty. Applying this principle, we hold that Congress had the authority to regulate state and local voting through the provisions of the Voting Rights

Act.[15]  *National League of Cities,* then, provides no reason to depart from our decision in *South Carolina* v. *Katzenbach* that "the Fifteenth Amendment supersedes contrary exertions of state power," 383 U. S., at 325, and that the Act is "an appropriate means for carrying out Congress' constitutional responsibilities," *id.,* at 308.[16]

## D

The appellants contend in the alternative that, even if the Act and its preclearance requirement were appropriate means of enforcing the Fifteenth Amendment in 1965, they had outlived their usefulness by 1975, when Congress extended the Act for another seven years. We decline this invitation to overrule Congress' judgment that the 1975 extension was warranted.

In considering the 1975 extension, Congress acknowledged that, largely as a result of the Act, Negro voter registration had improved dramatically since 1965. H. R. Rep., at 6; S. Rep., at 13. Congress determined, however, that "a bleaker side of the picture yet exists." H. R. Rep., at 7; S. Rep., at 13. Significant disparity persisted between the percentages of whites and Negroes registered in at least several of the covered jurisdictions. In addition, though the number of Negro elected officials had increased since 1965, most held only relatively minor positions, none held statewide office, and

---

[15] Indeed, *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976), strongly suggested this result by citing *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966), as one of several cases sanctioning "intrusions by Congress, acting under the Civil War Amendments, into the judicial, executive, and legislative spheres of autonomy previously reserved to the States. The legislation considered in each case was grounded on the expansion of Congress' powers—with the corresponding diminution of state sovereignty—found to be intended by the Framers and made part of the Constitution upon the States' ratification of those Amendments, a phenomenon aptly described as a 'carv[ing] out'. in *Ex parte Virginia,* [100 U. S. 339, 346 (1880)]." *Fitzpatrick* v. *Bitzer, supra,* at 455–456.

[16] See also *Katzenbach* v. *Morgan,* 384 U. S. 641, 646–647 (1966).

their number in the state legislatures fell far short of being representative of the number of Negroes residing in the covered jurisdictions. Congress concluded that, because minority political progress under the Act, though "undeniable," had been "modest and spotty," extension of the Act was warranted. H. R. Rep., at 7–11; S. Rep., at 11–19.

Congress gave careful consideration to the propriety of readopting § 5's preclearance requirement. It first noted that "[i]n recent years the importance of this provision has become widely recognized as a means of promoting and preserving minority political gains in covered jurisdictions." H. R. Rep., at 8; S. Rep., at 15. After examining information on the number and types of submissions made by covered jurisdictions and the number and nature of objections interposed by the Attorney General, Congress not only determined that § 5 should be extended for another seven years, it gave that provision this ringing endorsement:

> "The recent objections entered by the Attorney General . . . to Section 5 submissions clearly bespeak the continuing need for this preclearance mechanism. As registration and voting of minority citizens increases [sic], other measures may be resorted to which would dilute increasing minority voting strength.

> .        .        .        .        .

> "The Committee is convinced that it is largely Section 5 which has contributed to the gains thus far achieved in minority political participation, and it is likewise Sect[i]on 5 which serves to insure that that progress not be destroyed through new procedures and techniques. Now is not the time to remove those preclearance protections from such limited and fragile success." H. R. Rep., at 10–11.

See also S. Rep., at 15–19.

It must not be forgotten that in 1965, *95 years* after ratification of the Fifteenth Amendment extended the right to vote

to all citizens regardless of race or color, Congress found that racial discrimination in voting was an "insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *South Carolina* v. *Katzenbach,* 383 U. S., at 309. In adopting the Voting Rights Act, Congress sought to remedy this century of obstruction by shifting "the advantage of time and inertia from the perpetrators of the evil to its victims." *Id.,* at 328. Ten years later, Congress found that a 7-year extension of the Act was necessary to preserve the "limited and fragile" achievements of the Act and to promote further amelioration of voting discrimination. When viewed in this light, Congress' considered determination that at least another 7 years of statutory remedies were necessary to counter the perpetuation of 95 years of pervasive voting discrimination is both unsurprising and unassailable. The extension of the Act, then, was plainly a constitutional method of enforcing the Fifteenth Amendment.

## E

As their final constitutional challenge to the Act,[17] the individual appellants argue that, because no elections have been held in Rome since 1974, their First, Fifth, Ninth, and Tenth Amendment rights as private citizens of the city have been abridged. In blaming the Act for this result, these appellants identify the wrong culprit. The Act does not restrict private political expression or prevent a covered jurisdiction from holding elections; rather, it simply provides that elections may be held either under electoral rules in effect on November 1, 1964, or under rules adopted since that time that have been properly precleared. When the Attorney General refused to preclear the city's electoral changes, the city had the authority to conduct elections under its electoral scheme in effect on

---

[17] We do not reach the merits of the appellants' argument that the Act violates the Guarantee Clause, Art. IV, § 4, since that issue is not justiciable. See, *e. g., Baker* v. *Carr,* 369 U. S. 186 (1962).

November 1, 1964. Indeed, the Attorney General offered to preclear any technical amendments to the city charter necessary to permit elections under the pre-existing scheme or a modification of that scheme consistent with the Act. In these circumstances, the city's failure to hold elections can only be attributed to its own officials, and not to the operation of the Act.

## IV

Now that we have reaffirmed our holdings in *South Carolina* v. *Katzenbach* that the Act is "an appropriate means for carrying out Congress' constitutional responsibilities" and is "consonant with all . . . provisions of the Constitution," 383 U. S., at 308, we must address the appellants' contentions that the 1966 electoral changes and the annexations disapproved by the Attorney General do not, in fact, have a discriminatory effect. We are mindful that the District Court's findings of fact must be upheld unless they are clearly erroneous.

## A

We conclude that the District Court did not clearly err in finding that the city had failed to prove that the 1966 electoral changes would not dilute the effectiveness of the Negro vote in Rome.[18] The District Court determined that racial bloc voting existed in Rome. It found that the electoral changes from plurality-win to majority-win elections, numbered posts, and staggered terms, when combined with the presence of racial bloc voting and Rome's majority white population and at-large electoral system, would dilute Negro voting strength. The District Court recognized that, under the pre-existing plurality-win system, a Negro candidate would have a fair opportunity to be elected by a plurality of the vote

---

[18] Under § 5, the city bears the burden of proving lack of discriminatory purpose and effect. *Beer* v. *United States*, 425 U. S. 130, 140–141 (1976); *Georgia* v. *United States*, 411 U. S. 526, 538 (1973); *South Carolina* v. *Katzenbach*, 383 U. S., at 335.

if white citizens split their votes among several white candidates and Negroes engage in "single-shot voting" in his favor.[19]   The 1966 change to the majority vote/runoff election scheme significantly decreased the opportunity for such a Negro candidate since, "even if he gained a plurality of votes in the general election, [he] would still have to face the runner-up white candidate in a head-to-head runoff election in which, given bloc voting by race and a white majority, [he] would be at a severe disadvantage."   472 F. Supp., at 244 (footnotes omitted).[20]

---

[19] Single-shot voting has been described as follows:

"Consider [a] town of 600 whites and 400 blacks with an at-large election to choose four council members.   Each voter is able to cast four votes.   Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else.   The result is that each white candidate receives about 300 votes and the black candidate receives 400 votes.   The black has probably won a seat.   This technique is called single-shot voting.   Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates."   U. S. Commission on Civil Rights, The Voting Rights Act: Ten Years After, pp. 206–207 (1975).

[20] The District Court found that Rome's Negro citizens believed that a Negro will never be elected as long as the city's present electoral system remains in effect.   472 F. Supp., at 226.   Only four Negroes have ever sought elective office in Rome, and none of them was elected.   The campaign of the Reverend Clyde Hill, who made the strongest showing of the four, indicates both the presence of racial bloc voting in the city and the dilutive effect of the majority vote/runoff election scheme adopted in 1966.   The city's elections were operated under that scheme when Rev. Hill ran for the Board of Education in 1970.   With strong support from the Negro community, Rev. Hill ran against three white opponents and received 921 votes in the general election, while his opponents received 909, 407, and 143 votes, respectively.   Rev. Hill, then, would have been elected under the pre-1966 plurality-win voting scheme.   Under the majority-win/runoff election provisions adopted in 1966, however, a runoff election was held, and the white candidate who was the runner-up in the general election defeated Rev. Hill by a vote of 1409–1142.

The District Court's further conclusion that the city had failed to prove that the numbered posts, staggered terms, and Board of Education residency provisions would not have the effect of forcing head-to-head contests between Negroes and whites and depriving Negroes of the opportunity to elect a candidate by single-shot voting, *id.*, at 245, is likewise not clearly erroneous.[21] The District Court's holdings regarding all of the 1966 electoral changes are consistent with our statement in *Beer* v. *United States,* 425 U. S., at 141, that "the purpose of § 5 has always been to insure that no voting procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral [process]."

## B

The District Court also found that the city had failed to meet its burden of proving that the 13 disapproved annexations did not dilute the Negro vote in Rome. The

---

[21] In so holding, the District Court relied on this analysis by the United States Commission on Civil Rights:

" 'There are a number of voting rules which have the effect of frustrating single-shot voting. . . . [I]nstead of having one race for four positions, there could be four races, each for only one position. Thus for post no. 1 there might be one black candidate and one white, with the white winning. The situation would be the same for each post, or seat— a black candidate would always face a white in a head-to-head contest and would not be able to win. There would be no opportunity for single-shot voting. A black still might win if there were more than one white candidate for a post, but this possibility would be eliminated if there was also a majority requirement.

" '[Second,] each council member might be required to live in a separate district but with voting still at large. This—just like numbered posts— separates one contest into a number of individual contests.

" '[Third,] the terms of council members might be staggered. If each member has a 4-year term and one member is elected each year, then the opportunity for single-shot voting will never arise.' " 472 F. Supp., at 244, n. 95 (quoting U. S. Commission on Civil Rights, *supra* n. 19, at 207–208).

186

city's argument that this finding is clearly erroneous is severely undermined by the fact that it failed to present any evidence shedding meaningful light on how the annexations affected the vote of Rome's Negro community.

Because Rome's failure to preclear any of these annexations caused a delay in federal review and placed the annexations before the District Court as a group, the court was correct in concluding that the cumulative effect of the 13 annexations must be examined from the perspective of the most current available population data. Unfortunately, the population data offered by the city was quite uninformative. The city did not present evidence on the current general population and voting-age population of Rome, much less a breakdown of each population category by race.[22] Nor does the record reflect current information regarding the city's registered voters. The record does indicate the number of Negro and white registered voters in the city as of 1975, but it is unclear whether these figures included persons residing in the annexed areas in dispute.

Certain facts are clear, however. In February 1978, the most recent date for which any population data were compiled, 2,582 whites and only 52 Negroes resided in the disapproved annexed areas. Of these persons, 1,797 whites and only 24

[22] In *City of Richmond* v. *United States*, 422 U. S. 358 (1975), and *City of Petersburg* v. *United States*, 354 F. Supp. 1021 (DC 1972), summarily aff'd, 410 U. S. 962 (1973), evidence of the racial composition of the general population was used to assess the impact of annexations on the importance of the Negro vote in the community. This information, when coupled with data on the racial composition of the community's voting-age population, provides more probative evidence in such cases than does voter registration data, which may perpetuate the effects of prior discrimination in the registration of voters, *Ely* v. *Klahr*, 403 U. S. 108, 115, n. 7 (1971); *Burns* v. *Richardson*, 384 U. S. 73, 92–93 (1966), or reflect a belief among the Negro population that it cannot elect a candidate of its choice, cf. n. 20, *supra*. Current voting-age population data are probative because they indicate the electoral potential of the minority community.

Negroes were of voting age, and 823 whites and only 9 Negroes were registered voters. We must assume that these persons moved to the annexed areas from outside the city, rather than from within the preannexation boundaries of the city, since the city, which bore the burden of proof, presented no evidence to the contrary.

The District Court properly concluded that these annexations must be scrutinized under the Voting Rights Act. See *Perkins* v. *Matthews,* 400 U. S., at 388–390. By substantially enlarging the city's number of white eligible voters without creating a corresponding increase in the number of Negroes, the annexations reduced the importance of the votes of Negro citizens who resided within the preannexation boundaries of the city. In these circumstances, the city bore the burden of proving that its electoral system "fairly reflects the strength of the Negro community as it exists after the annexation[s]." *City of Richmond* v. *United States,* 422 U. S., at 371. The District Court's determination that the city failed to meet this burden of proof for City Commission elections was based on the presence of three vote-dilutive factors: the at-large electoral system, the residency requirement for officeholders, and the high degree of racial bloc voting. Particularly in light of the inadequate evidence introduced by the city, this determination cannot be considered to be clearly erroneous.

The judgment of the District Court is affirmed.

*It is so ordered.*

MR. JUSTICE BLACKMUN, concurring.

I join the Court's opinion but write separately to state my understanding of the effect of the holding in Part IV–B. The Court there affirms, as not clearly erroneous, the District Court's determination that the city of Rome failed to meet its burden of disproving that the 13 disputed annexations had a discriminatory effect. That issue, for me, is close, but I accept the District Court's ruling. The holding, however,

does seem to have the anomalous result of leaving the voters residing in those annexed areas within the jurisdiction of Rome's Board of Education, but outside the jurisdiction of its City Commission.* As the appellees point out, however, Brief for Appellees 40–42, affirmance of the District Court's holding does not preclude the city from altering this anomaly.

It seems significant to me that the District Court adopted the remedial device of conditioning its approval of the annexations on Rome's abandonment of the residency requirement for City Commission elections. It thus denied the city's motion for approval of the annexations "without prejudice to renewal . . . upon the undertaking of suitable action consistent with the views expressed herein." 472 F. Supp. 221, 249 (DC 1979). This remedial device, conditioning the approval of annexations on the elimination of pre-existing discriminatory aspects of a city's electoral system, was developed in *City of Petersburg* v. *United States,* 354 F. Supp. 1021 (DC 1972), summarily aff'd, 410 U. S. 962 (1973), and expressly approved by this Court in *City of Richmond* v. *United States,* 422 U. S. 358, 369–371 (1975).

I entertain some doubt about the District Court's apparent conclusion that the residency requirement for Commission elections, standing alone, would render the postannexation electoral system of Rome one that did not "fairly recogniz[e] the minority's political potential," within the meaning of *City of Richmond. Id.,* at 378. The discriminatory effect of a residency requirement in an at-large election system results from its necessary separation of one contest into a number of individual contests, thereby frustrating minority efforts to utilize effectively single-shot voting. See *ante,* at 185, n. 21.

---

*The Attorney General, in response to the city's motion for reconsideration of its submissions, agreed to preclear the 13 annexations for purposes of Board of Education elections. That decision was based solely on the fact that there was no residency requirement for Board of Education elections under Rome's pre-1966 electoral rules. See *ante,* at 160, 162.

And in a city the size of Rome, one might reasonably conclude that a requirement that one Commission member reside in each of nine wards would have such an effect. The District Court failed to analyze, however, the impact of the Attorney General's preclearance of Rome's reduction of the number of wards in the city from nine to three. The potential for effective single-shot voting would not be frustrated by a requirement that three commissioners be elected from each of three wards, so long as candidates were not required to run for a particular "numbered post" within each ward. Given the Attorney General's preclearance of the reduction of the number of wards from nine to three, the latter requirement is one that the District Court should have considered in determining whether the presence of a residency requirement would necessarily lead to the conclusion that Rome's postannexation electoral system is one that does not fairly recognize the minority's political potential.

I do not dissent from the affirmance of the District Court's holding with respect to the annexations, however, because the appellees have conceded that Rome need not abandon its residency requirement in order to keep the annexed areas within the jurisdiction of the City Commission. Appellees state:

> "If the City wished to retain both a residency requirement and at-large elections, . . . it could couple its pre-1966 procedures with its subsequent shift to a system of electing three commissioners from each of three wards. (The Attorney General had not objected to the change from nine wards to three larger wards.) When candidates are running concurrently for three unnumbered positions in each of the three wards, without a majority-vote requirement, there can be no head-to-head contest, and single-shot voting by black voters would give them a chance to elect the candidate they supported." Brief for Appellees 41–42.

Thus, on the understanding that the Attorney General would not object to the District Court's approval of the annexations insofar as they expand the jurisdiction of the City Commission, if the city either eliminates the residency requirement and returns to a nine ward system, or retains the residency requirement and the three-ward system that has been in effect since 1966, I join in Part IV–B of the Court's opinion.

MR. JUSTICE STEVENS, concurring.

Although I join the Court's opinion, the dissenting opinions prompt me to emphasize two points that are crucial to my analysis of the case; both concern the statewide nature of the remedy Congress authorized when it enacted the Voting Rights Act of 1965. The critical questions are: (1) whether, as a statutory matter, Congress has prescribed a statewide remedy that denies local political units within a covered State the right to "bail out" separately; and (2) if so, whether, as a constitutional matter, such statewide relief exceeds the enforcement powers of Congress. If, as I believe, Congress could properly impose a statewide remedy and in fact did so in the Voting Rights Act, then the fact that the city of Rome has been innocent of any wrongdoing for the last 17 years is irrelevant; indeed, we may assume that there has never been any racial discrimination practiced in the city of Rome. If racially discriminatory voting practices elsewhere in the State of Georgia were sufficiently pervasive to justify the statewide remedy Congress prescribed, that remedy may be applied to each and every political unit within the State, including the city of Rome.

I

Section 5 of the Voting Rights Act imposes certain restrictions on covered States and their political subdivisions, as well as on political subdivisions in noncovered States that have been separately designated as covered by the Attorney General pursuant to § 4 (b) of the Act. Section 4 (a) of the Act

permits both States and separately designated political subdivisions in noncovered States to bail out of § 5's restrictions by demonstrating that they have not engaged in racially discriminatory voting practices for a period of 17 years. In *United States* v. *Board of Commissioners of Sheffield, Ala.,* 435 U. S. 110, the Court construed the word "State" as used in §§ 4 (a) and 5 to include all political units within a State even though they did not satisfy the statutory definition of a "political subdivision," [1] and even though that definition had been added to the statute for the express purpose of limiting coverage.[2]

My opinion that the *Sheffield* Court's construction of the Act was erroneous does not qualify the legal consequences of that holding. See *Dougherty County Board of Education* v. *White,* 439 U. S. 32, 47 (STEVENS, J., concurring).[3] Nor does it prevent me from joining the Court's holding today that a political unit within a covered State is not entitled to bail out under § 4 (a).[4] For both the plain language of the statute

---

[1] Section 14 (c) (2) of the Act, as set forth in 42 U. S. C. § 1973*l* (c) (2), provides:

"The term 'political subdivision' shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting."

[2] See 435 U. S., at 142–143 (STEVENS, J., dissenting).

[3] In any event, the city of Rome may be subject to § 5 even under the reasoning of my dissent in *Sheffield.* As noted above, political subdivisions (*i. e.,* counties and other subdivisions that register voters) in covered States are clearly subject to the restrictions of § 5. In this case the city of Rome registered voters from 1964 to 1969, when the responsibility was transferred to Floyd County, see Stipulation No. 5, App. 58. Thus, from 1965 to 1969, the city was clearly covered by the Act. Because it did not preclear the transfer of voting registration to the county, *ibid.,* it at least arguably remains a "political subdivision" for purposes of both §§ 4 (a) and 5.

[4] It should be noted that there is some tension between the Court's language in *Sheffield* and its statement today that *Sheffield* did not "suggest that a municipality in a covered State is itself a 'State' for purposes of

and its legislative history unambiguously indicate that only covered States and separately designated political subdivisions in noncovered States are entitled to take advantage of that provision. See § 4 (a) and H. R. Rep. No. 439, 89th Cong., 1st Sess., 14 (1965), quoted *ante,* at 169. The political subdivisions of a covered State, while subject to § 5's preclearance requirements, are not entitled to bail out in a piecemeal fashion; rather, they can only be relieved of their preclearance obligations if the entire State meets the conditions for a bailout.

Given the Court's decision in *Sheffield* that all political units in a covered State are to be treated for § 5 purposes as though they were "political subdivisions" of that State, it follows that they should also be treated as such for purposes of § 4 (a)'s bailout provisions. Moreover, even without the *Sheffield* decision, it would be illogical to deny separate bailout relief to larger political units such as counties—which are clearly "political subdivisions" as that term is defined in § 14 (c)(2)—and to grant it to smaller units such as municipalities and school boards.

## II

The second question is whether Congress has the power to prescribe a statewide remedy for discriminatory voting prac-

---

the § 4 (a) exemption procedure." See *ante,* at 168. Compare the latter statement with, *e. g.,* 435 U. S., at 128, where the Court stated that it was "wholly logical to interpret 'State . . . with respect to which' § 4 (a) is in effect as referring to all political units within it." See also *id.,* at 129, n. 17:

"Our Brother STEVENS' dissent misconceives the basis for the conclusion that § 5's terms are susceptible of an interpretation under which Sheffield is covered. We believe that the term 'State' can bear a meaning that includes all state actors within it and that, given the textual interrelationship between § 5 and § 4 (a) and the related purposes of the two provisions, such a reading is a natural one."

To the extent that the Court has disavowed the foregoing comments, I, of course, agree.

tices if it does not allow political units that can prove themselves innocent of discrimination to bail out of the statute's coverage. In Part III–B of its opinion, the Court explains why Congress, under the authority of § 2 of the Fifteenth Amendment, may prohibit voting practices that have a discriminatory effect in instances in which there is ample proof of a longstanding tradition of purposeful discrimination. I think it is equally clear that remedies for discriminatory practices that were widespread within a State may be applied to every governmental unit within the State even though some of those local units may have never engaged in purposeful discrimination themselves.[5] In short, Congress has the constitutional power to regulate voting practices in Rome, so long as it has the power to regulate such practices in the entire State of Georgia. Since there is no claim that the entire State is entitled to relief from the federal restrictions, Rome's separate claim must fail.

I therefore join the Court's opinion.

MR. JUSTICE POWELL, dissenting.

Two years ago this Court held that the term "State" in § 4 (a) of the Voting Rights Act includes all political subdivisions that control election processes, and that those sub-

---

[5] The same principle applies to a court's exercise of its remedial powers. Thus, in an antitrust action, a remedy may be appropriate even though it "curtail[s] the exercise of liberties that the [defendant] might otherwise enjoy." *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 697. Similarly, in constitutional cases, a court may impose a remedy that requires more of the defendant than the Constitution itself would require in the absence of any history of wrongdoing. See, *e. g., Houchins* v. *KQED, Inc.*, 438 U. S. 1, 40 (STEVENS, J., dissenting). The Court has recently applied this principle to school desegregation cases, holding that a systemwide remedy—as opposed to a remedy concentrating on specific instances of discrimination—may be justified by a prior history of pervasive, systemwide discrimination. *Columbus Board of Education* v. *Penick*, 443 U. S. 449; *Dayton Board of Education* v. *Brinkman*, 443 U. S. 526.

divisions are subject to the requirement in § 5 of the Act that federal authorities preclear changes in voting procedures. *United States* v. *Board of Commissioners of Sheffield, Ala.,* 435 U. S. 110 (1978) (*Sheffield*). Today the Court concludes that those subdivisions are not within the term "State" when it comes to an action to "bail out" from the preclearance requirement. Because this decision not only conflicts with *Sheffield* but also raises grave questions as to the constitutionality of the Act, I dissent.

## I

Although I dissent on statutory and constitutional grounds, the need to examine closely the Court's treatment of the Voting Rights Act is sharply illustrated by the facts of this case. In Rome, a city of about 30,000, approximately 15% of the registered voters are black. This case involves two types of local action affecting voting. First, in 1966 the Georgia Assembly established a majority vote requirement for the City Commission and the Board of Education, and reduced the number of election wards from nine to three. Under the new arrangement, three city commissioners and two members of the Board of Education are chosen from each ward for numbered posts.[1] Second, between 1964 and 1975 Rome completed 60 territorial annexations, 13 of which are at issue in this case. The annexations allegedly diluted the black vote in Rome by disproportionately adding white voters. But 9 of the 13 relevant tracts of land were completely unpopulated when they were taken over by the city. By 1978 the additional white voters in the annexed land had caused a net decline of 1% in the black share of Rome's electorate.[2]

---

[1] As part of the package of revisions, the Assembly increased the Board of Education from five to six members, eased voter registration requirements, and shifted registration responsibility to the county. 472 F. Supp. 221, 224 (DC 1979).

[2] The statistics on this question are not altogether satisfactory, since the 1978 population of the annexed areas must be compared to 1975

There is substantial conflict between the ultimate ruling of the three-judge District Court in this case and its findings of fact. That court made a finding that Rome has not employed a "literacy test or other device . . . as a prerequisite to voter registration during the past seventeen years," and that "in recent years there have been no other direct barriers to black voting in Rome." 472 F. Supp. 221, 224, 225 (DC 1979). The court observed that white officials have encouraged blacks to run for office, that there was no evidence of obstacles to political candidacy by blacks, and that a recent black contender for the Board of Education narrowly lost a runoff with 45% of the vote (in a city where blacks make up only 15% of the voters). Although no black has been elected to the municipal government, the court stated that the "white elected officials of Rome . . . are responsive to the needs and interests of the black community," and actively seek black political support.[3]  *Id.,* at 225. Indeed, the District Court concluded that in Rome "the black community, if it chooses to vote as a group, can probably determine the outcome of many if not most contests." *Ibid.*

Despite these findings, the District Court refused to approve the annexations or the changes in voting procedures. The court held that the city had not proved that the annexations and voting changes did not reduce the political influence of Rome's blacks. *Id.,* at 245, 247. I have many reservations about that conclusion. I note in particular that a black candidate running under the challenged election rules commanded

voter registration totals. Given that 16.6% of the city's voters were black in 1975, that percentage drops only to 15.6% after adding the 823 white voters and 9 black voters who lived in the annexed areas in 1978. See Brief for Appellees 38, n. 26.

[3] The District Court also noted that the city has "made an effort to upgrade some black neighborhoods," has subsidized the transit system which has a predominantly black ridership, and has hired a number of blacks for skilled and supervisory positions in the municipal government. 472 F. Supp., at 225.

three times the share of votes that the black community holds.
Moreover, nine of the annexations at issue were of vacant
land and thus had no effect at all on voting when they
occurred. Nevertheless, I need not consider whether the Dis-
trict Court's ruling on the evidence is clearly erroneous.
Rather, I cite the apparent factual inconsistencies of the hold-
ing below because they highlight how far the courts, including
this Court, have departed from the original understanding of
the Act's purpose and meaning.[4] Against this background, I
address the substantive questions posed by this case.

## II

Under § 4 (a) of the Voting Rights Act a State or political
subdivision can attempt to end its preclearance obligations
through a declaratory judgment action (or "bailout") in the
District Court for the District of Columbia. 42 U. S. C.
§ 1973b (a). Bailout must be granted if the District Court
finds that in that jurisdiction no "test or device has been used
during the seventeen years preceding the filing of the action
for the purpose or with the effect of denying or abridging the
right to vote on account of race or color." *Ibid.* The District
Court expressly found that the city of Rome meets this stand-
ard and that blacks participate actively in Rome's political
life. See *supra,* at 195. These findings demonstrate that the
city has satisfied both the letter and the spirit of the bailout
provision. Nevertheless, the District Court held that as long
as Georgia is covered by § 5 of the Act, the city of Rome may
not alter any voting practice without the prior approval of
federal authorities.[5]

---

[4] The Court's opinion simply ignores the most relevant facts. In so
doing, the Court averts its eyes from the central paradox of this case:
Even though Rome has met every criterion established by the Voting
Rights Act for protecting the political rights of minorities, the Court holds
that the city must remain subject to preclearance.

[5] Section 5 permits two methods of preclearance. A local government
may ask the District Court for the District of Columbia for a ruling that

The Court today affirms the decision of the District Court, and holds that no subdivision may bail out so long as its State remains subject to preclearance. This conclusion can be reached only by disregarding the terms of the statute as we have interpreted them before. Section 4 (a) makes bailout available to "such State or subdivision," language that refers back to the provision's ban on the use of literacy tests (i) "in any State" reached by § 4 (b) of the Act, or (ii) "in any political subdivision" which is covered "as a separate unit." [6] Because the entire State of Georgia is covered under § 4 (b), this case concerns the first category in that definition.[7] Thus the crucial language here, as in *Sheffield*, is § 4 (a)'s prohibition of tests or devices "in any State" covered under § 4 (b).

---

the voting change is acceptable, or it may submit the change to the Attorney General for him to accept or reject within 60 days. 42 U. S. C. § 1973c. The administrative procedure is used almost exclusively, since it takes less time.

[6] Section 4 (a), as set forth in 42 U. S. C. § 1973b (a), provides in relevant part:

"To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device *in any State with respect to which the determinations have been made under the first two sentences of subsection (b) of this section or in any political subdivision with respect to which such determinations have been made as a separate unit,* unless the United States District Court for the District of Columbia in an action for a declaratory judgment brought by *such State or subdivision* against the United States has determined that no such test or device has been used during the seventeen years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color. . . ." (Emphasis supplied.)

[7] Under § 4 (b), a State or political subdivision is subject to the Act if the Director of the Census finds that less than 50% of the eligible population voted in the last Presidential election, and the Attorney General determines that a discriminatory "test or device" was maintained in the jurisdiction in 1964. Those determinations, which are unreviewable, trigger the application of the preclearance requirement of § 5. 42 U. S. C. §§ 1973b (b), 1973c.

The *Sheffield* Court emphasized the territorial content of this key phrase. The Court reasoned that by referring to discriminatory practices "in" a State, Congress extended the ban on tests and devices to all political subdivisions with any control over voting. 435 U. S., at 120. Since the same language in § 4 (a) also defines the applicability of § 5, the Court continued, subdivisions must also be subject to preclearance. Consequently, federal authorities now must review all changes in local voting rules and regulations in States covered by the Act. 435 U. S., at 126–127.

The availability of a bailout action is defined by exactly the same phrase that the Court interpreted in *Sheffield.* In the bailout context, however, the Court today finds that the language does not reach political subdivisions. The Court thus construes the identical words in § 4 (a) to have one meaning in one situation and a wholly different sense when applied in another context. Such a protean construction reduces the statute to irrationality.

This irrationality is evident in the contrast between the rights of localities like Rome that are in States covered by § 4 (b), and those of covered local governments that are located in States not covered by the Act. Twenty-eight subdivisions in the latter group have bailed out from the preclearance obligation in six separate actions.[8] Yet the only

---

[8] *Counties of Choctaw and McCurtain, Okla.* v. *United States,* C. A. No. 76–1250 (DC May 12, 1978) (two counties); *New Mexico, Curry, McKinley and Otero Counties* v. *United States,* C. A. No. 76–0067 (DC July 30, 1976) (three counties); *Maine* v. *United States,* C. A. No. 75–2125 (DC Sept. 17, 1976) (13 municipalities and 5 "plantations"); *Wake County, N. C.* v. *United States,* C. A. No. 1198–66 (DC Jan. 23, 1967) (one county); *Elmore County, Idaho* v. *United States,* C. A. No. 320–66 (DC Sept. 22, 1966) (one county); *Apache, Navaho and Coconino Counties, Ariz.* v. *United States,* 256 F. Supp. 903 (DC 1966) (three counties). Three counties in New York City bailed out in 1972, *New York* v. *United States,* C. A. No. 2419–71 (DC Apr. 13, 1972), but the bailout order was rescinded two years later after a District Court found that the State had conducted elections in English only, thereby

difference between those governments and the city of Rome is that the State in which Rome is located is itself subject to the Voting Rights Act. There is no reasoned justification for allowing a subdivision in North Carolina to bail out but denying a similar privilege to a subdivision in Georgia when both have been found to be in full compliance with the bailout criteria.

The District Court acknowledged, and the Court today does not deny, the "abstract force" of this argument. The argument nevertheless fails, according to the Court's opinion, for two reasons: (i) *Sheffield* "did not hold that cities such as Rome are 'political subdivisions'" or "States," but merely subjected such entities to the preclearance requirement of § 5; and (ii) congressional Reports accompanying the Voting Rights Act of 1965 state that bailout should not be available to a subdivision located in a State covered by the Act. *Ante,* at 168–169. Neither reason supports the Court's decision. That *Sheffield* did not identify cities like Rome as "States" or "political subdivisions" as defined by the Act does not answer the point that the construction of "State" in *Sheffield* should control the availability of bailout. Both in terms of logic and of fairness, if Rome must preclear it must also be free to bail out. Second, it is elementary that where the language of a statute is clear and unambiguous, there is no occasion to look at its legislative history. We resort to legislative materials only when the congressional mandate is unclear on its face.

---

violating the Act. *New York* v. *United States,* C. A. No. 2419–71 (DC Jan. 18, 1974) (referring to *Torres* v. *Sachs,* C. A. No. 73–3921 (CES) (SDNY Sept. 27, 1973)), summarily aff'd, 419 U. S. 888 (1974).

Bailout was denied in one action involving a local subdivision, *Gaston County, N. C.* v. *United States,* 395 U. S. 285 (1969), and three were dismissed by stipulation of the parties, *Board of Commissioners, El Paso County, Colo.* v. *United States,* C. A. No. 77–0185 (DC No. 8, 1977); *Yuba County, Cal.* v. *United States,* C. A. No. 75–2170 (DC May 25, 1976); *Nash County, N. C.* v. *United States,* C. A. No. 1702–66 (DC Sept. 26, 1969).

*Ex parte Collett*, 337 U. S. 55, 61 (1949); *United States* v. *Oregon*, 366 U. S. 643, 648 (1961). Although "committee reports in particular are often a helpful guide to the meaning of ambiguous statutory language, even they must be disregarded if inconsistent with the plain language of the statute." *Gooding* v. *United States*, 416 U. S. 430, 468 (1974) (MARSHALL, J., dissenting).

After *Sheffield,* there can be little dispute over the meaning of "State" as used in § 4 (a): It includes all political subdivisions that exercise control over elections.[9] Accordingly, there is no basis for the Court's reliance on congressional statements that are inconsistent with the terms of the statute. If § 4 (a) imposes the burden of preclearance on Rome, the same section must also relieve that burden when the city can demonstrate its compliance with the Act's quite strict requirements for bailout.

### III

There is, however, more involved here than incorrect construction of the statute. The Court's interpretation of § 4 (a) renders the Voting Rights Act unconstitutional as applied to the city of Rome. The preclearance requirement both intrudes on the prerogatives of state and local governments and abridges the voting rights of all citizens in States covered under the Act. Under § 2 of the Fifteenth Amendment, Congress may impose such constitutional deprivations only if it is acting to remedy violations of voting rights. See *South Carolina* v. *Katzenbach,* 383 U. S. 301, 327–328 (1966); *Katzenbach* v. *Morgan,* 384 U. S. 641, 667 (1966) (Harlan, J., dissenting). In view of the District Court finding that Rome has not denied or abridged the voting rights of blacks, the

---

[9] This construction applies to political subdivisions defined by § 14 (c) (2) of the Act, 42 U. S. C. § 1973*l* (c) (2), as well as to governments like Rome that do not fall within that statutory definition. Thus, under *Sheffield's* statutory interpretation, all subdivisions in States covered by the Act should be entitled to bail out. The constitutional analysis of Part III, *infra,* reaches the same conclusion.

Fifteenth Amendment provides no authority for continuing those deprivations until the entire State of Georgia satisfies the bailout standards of § 4 (a).[10]

When this Court first sustained the Voting Rights Act of 1965, it conceded that the legislation was "an uncommon exercise of congressional power." *South Carolina* v. *Katzenbach, supra,* at 334. The Court recognized that preclearance under the Act implicates serious federalism concerns. 383 U. S., at 324–327. As MR. JUSTICE STEVENS noted in *Sheffield,* the statute's "encroachment on state sovereignty is significant and undeniable." 435 U. S., at 141 (dissenting opinion).[11] That encroachment is especially troubling because it destroys local control of the means of self-government, one of the central values of our polity.[12] Unless the federal structure pro-

---

[10] In view of the narrower focus of my approach to the statutory and constitutional issues raised in this case, I do not reach the broad analysis offered by MR. JUSTICE REHNQUIST's dissent.

[11] Other Justices have expressed the same concern. *E. g., South Carolina* v. *Katzenbach,* 383 U. S. 301, 358 (1966) (Black, J., concurring and dissenting); *Allen* v. *State Board of Elections,* 393 U. S. 544, 586, and n. 4 (1969) (Harlan, J., concurring in part and dissenting in part); see also *Georgia* v. *United States,* 411 U. S. 526, 545 (1973) (POWELL, J., dissenting).

In *National League of Cities* v. *Usery,* 426 U. S. 833, 856, n. 20 (1976), the Court noted that because political subdivisions "derive their authority and power from their respective States," their integrity, like that of the States, is protected by the principles of federalism.

[12] The federal system allocates primary control over elections to state and local officials. *Oregon* v. *Mitchell,* 400 U. S. 112, 125 (1970) (opinion of Black, J.); *id.,* at 201 (opinion of Harlan, J.); *Lassiter* v. *Northampton County Board of Elections,* 360 U. S. 45, 50 (1959).

This Court has emphasized the importance in a democratic society of preserving local control of local matters. See *Milliken* v. *Bradley,* 418 U. S. 717, 744 (1974) (federal court control of local schools "would deprive the people of control of schools through their elected representatives"); *James* v. *Valtierra,* 402 U. S. 137, 143 (1971) (local referendum on public housing project "ensures that all the people of a community will have a voice in a decision which may lead to large expenditures . . . and to lower tax revenues"). Preservation of local control, naturally

vides some protection for a community's ordering of its own democratic procedures, the right of each community to determine its own course within the boundaries marked by the Constitution is at risk. Preclearance also operates at an individual level to diminish the voting rights of residents of covered areas. Federal review of local voting practices reduces the influence that citizens have over policies directly affecting them, and strips locally elected officials of their autonomy to chart policy.

The Court in *South Carolina* v. *Katzenbach, supra,* did not lightly approve these intrusions on federalism and individual rights. It upheld the imposition of preclearance as a prophylactic measure based on the remedial power of Congress to enforce the Fifteenth Amendment. But the Court emphasized that preclearance, like any remedial device, can be imposed only in response to some harm. When Congress approved the Act, the Court observed, there was "reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act." 383 U. S., at 329. Since the coverage formula in § 4 (b) purported to identify accurately those jurisdictions that had engaged in voting discrimination, the imposition of preclearance was held to be justified "at least in the absence of proof that [the state or local government has] been free of substantial voting discrimination in recent years." 383 U. S., at 330.[13]

---

enough, involves protecting the integrity of state and local governments. See *National League of Cities* v. *Usery, supra,* at 855; *Coyle* v. *Oklahoma,* 221 U. S. 559, 565 (1911).

[13] The Court found important confirmation of the rationality of the coverage formula in the fact that there was no evidence of "recent racial discrimination involving tests and devices" in States or subdivisions exempted from preclearance. 383 U. S., at 331.

This Court took a similar approach when it affirmed the temporary suspension of all literacy tests by Congress in 1970. *Oregon* v. *Mitchell, supra.* The entire Court agreed with Mr. Justice Black's view that

The Court in *South Carolina* v. *Katzenbach* emphasized, however, that a government subjected to preclearance could be relieved of federal oversight if voting discrimination in fact did not continue or materialize during the prescribed period.

> "Acknowledging the possibility of overbreadth, the Act provides for termination of special statutory coverage at the behest of States and political subdivisions in which the danger of substantial voting discrimination has not materialized during the preceding [statutorily defined period]." *Id.,* at 331.

Although this passage uses the term "overbreadth" in an unusual sense, the point is clear. As long as the bailout option is available, there is less cause for concern that the Voting Rights Act may overreach congressional powers by imposing preclearance on a nondiscriminating government. Without bailout, the problem of constitutional authority for preclearance becomes acute.

The Court today decrees that the citizens of Rome will not have direct control over their city's voting practices until the entire State of Georgia can free itself from the Act's restrictions. Under the current interpretation of the word "State" in § 4 (a), Georgia will have to establish not only that it has satisfied the standards in § 4 (a), but also that each and every one of its political subdivisions meets those criteria. This outcome makes every city and county in Georgia a hostage to the errors, or even the deliberate intransigence, of a single sub-

---

the congressional action was justified by the "long history of the discriminatory use of literacy tests to disfranchise voters on account of their race." 400 U. S., at 132. See *id.,* at 146 (opinion of Douglas, J.); *id.,* at 216, and n. 94 (opinion of Harlan, J.); *id.,* at 234–235 (opinion of BRENNAN, WHITE, and MARSHALL, JJ.); *id.,* at 284 (opinion of STEWART, J.). That history supported temporary suspension of those few literacy tests still in use, see *id.,* at 147 (opinion of Douglas, J.), without providing any bailout-like option. In contrast, preclearance involves a broad restraint on all state and local voting practices, regardless of whether they have been, or even could be, used to discriminate.

division.[14]   Since the statute was enacted, only one State has succeeded in bailing out—Alaska in 1966, and again in 1971.[15] That precedent holds out little or no hope for more populous States such as Georgia.   Demonstrating a right to bailout in 1966 for Alaska's 272,000 people and 56 political subdivisions, or in 1971 for that State's 302,000 people and 60 subdivisions, is a far cry from seeking bailout now on behalf of Georgia's approximately 5 million people and 877 local governments.[16]

---

[14] Tr. of Oral Arg. 38.   The Court's position dictates this eccentric result by insisting that subdivisions in covered States can be relieved of preclearance only when their State bails out.   In my view this also would cast serious doubt on the Act's constitutionality as applied to any State which could not bail out due to the failings of a single subdivision.   A rational approach would treat the state and local governments independently for purposes of bailout.   If subdivisions in Georgia were free to seek bailout on their own, then a bailout action by the State could properly focus on the State's voting policies.   Then, if Georgia were entitled to bail out, preclearance would continue to apply to subdivisions that by their own noncompliance met the coverage criteria of § 4 (b).   Of course, the situation would be different if the State had contributed, overtly or covertly, to the subdivision's failure to comply.

[15] Alaska v. United States, C. A. No. 101–66 (DC Aug. 17, 1966); Alaska v. United States, C. A. No. 2122–71 (DC Mar. 10, 1972).   Alaska's 1971 suit was prompted by recoverage of the State under the Act in the 1970 extension.   The 1975 extension of the Act also re-established coverage of Alaska, which filed but abandoned yet another bailout suit. Alaska v. United States, C. A. No. 78–0484 (DC May 10, 1979) (stipulated dismissal of action).

One other State—Virginia—has attempted to bail out under § 4 (a). Virginia v. United States, 386 F. Supp. 1319 (DC 1974), summarily aff'd, 420 U. S. 901 (1975).   The court held that Virginia did not satisfy § 4 (a) because a state literacy test administered in some localities between 1963 and 1965 was discriminatory in the context of the inferior education offered to Virginia blacks in certain rural counties before that period.

[16] The Solicitor General states that Georgia has 159 counties, 530 municipalities, and 188 other subdivisions that now must preclear every voting change, no matter how irrelevant the change might be to discrimination in voting.   App. to Brief for Appellees 1a.

Today's ruling therefore will seal off the constitutionally necessary safety valve in the Voting Rights Act.

The preclearance requirement enforces a presumption against voting changes by certain state and local governments. If that presumption is restricted to those governments meeting § 4 (b)'s coverage criteria, and if the presumption can be rebutted by a proper showing in a bailout suit, the Act may be seen, as the *South Carolina* v. *Katzenbach* Court saw it, as action by Congress at the limit of its authority under the Fifteenth Amendment. But if governments like the city of Rome may not bail out, the statute oversteps those limits. For these reasons, I would reverse the judgment of the District Court.[17]

---

[17] On a practical level, the District Court argued that since more than 7,000 subdivisions currently are required to preclear voting changes, bailout suits by a small percentage of those subdivisions would swamp that court. 472 F. Supp., at 231–232. In view of the acknowledged difficulties that confront a local government in seeking bailout in the District of Columbia, it is by no means self-evident that the "floodgates" perceived by the court would ever open. Such suits, involving substantial expense as well as uncertainty, would not likely be initiated unless there were a substantial likelihood of success. Moreover, the court's argument ignores the procedures of a bailout suit. Section 4 (a) directs the Attorney General not to contest bailout if he finds that the state or local government has not used a discriminatory test or device over the preceding 17 years. 42 U. S. C. § 1973b (a). In fact, the Attorney General consented to bailout in the nine actions under § 4 (a) that have succeeded, while only three bailout suits have gone to trial. See nn. 8 and 15, *supra*. Thus the Department of Justice, not the courts, would shoulder much of the added burden that might arise from recognizing a bailout right for governments like the city of Rome. That burden could hardly be more onerous than the Attorney General's present responsibility for preclearing all voting changes in 7,000 subdivisions. In the first six months of 1979 over 3,200 such voting changes were submitted to the Attorney General, a rate of more than 25 per working day. Letter to Joseph W. Dorn from Drew S. Days III, Assistant Attorney General, Civil Rights Division, U. S. Department of Justice (Aug. 3, 1979), reprinted in App. to Brief for Appellants 1c.

These astonishing figures compare unfavorably with those cited by MR. JUSTICE STEVENS in his *Sheffield* dissent, where he questioned the efficacy of

## IV

If there were reason to believe that today's decision would protect the voting rights of minorities in any way, perhaps this case could be viewed as one where the Court's ends justify dubious analytical means. But the District Court found, and no one denies, that for at least 17 years there has been no voting discrimination by the city of Rome. Despite this record, the Court today continues federal rule over the most local decisions made by this small city in Georgia. Such an outcome must vitiate the incentive for any local government in a State covered by the Act to meet diligently the Act's requirements. Neither the Framers of the Fifteenth Amendment nor the Congress that enacted the Voting Rights Act could have intended that result.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEWART joins, dissenting.

We have only today held that the city of Mobile does not violate the Constitution by maintaining an at-large system of electing city officials unless voters can prove that system is a product of purposeful discrimination. *City of Mobile* v. *Bolden, ante,* p. 55. This result is reached even though the black residents of Mobile have demonstrated that racial "bloc" voting has prevented them from electing a black representative to the city government. The Court correctly concluded that a city has no obligation under the Constitution

---

the Attorney General's review of preclearance requests that then were arriving at the rate of only four a day. *United States* v. *Board of Commissioners of Sheffield, Ala.,* 435 U. S. 110, 147–148, and nn. 8, 10. (1978). See *Berry* v. *Doles,* 438 U. S. 190, 200–201 (1978) (POWELL, J., concurring in judgment). It hardly need be added that no senior officer in the Justice Department—much less the Attorney General—could make a thoughtful, personal judgment on an average of *25* preclearance petitions per day. Thus, important decisions made on a democratic basis in covered subdivisions and States are finally judged by unidentifiable employees of the federal bureaucracy, usually without anything resembling an evidentiary hearing.

to structure its representative system in a manner that maximizes the black community's ability to elect a black representative. Yet in the instant case, the city of Rome is prevented from instituting precisely the type of structural changes which the Court says Mobile may maintain consistently with the Civil War Amendments, so long as their purpose be legitimate, because Congress has prohibited these changes under the Voting Rights Act as an exercise of its "enforcement" power conferred by those Amendments.

It is not necessary to hold that Congress is limited to merely providing a forum in which aggrieved plaintiffs may assert rights under the Civil War Amendments in order to disagree with the Court's decision permitting Congress to straitjacket the city of Rome in this manner. Under § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment, Congress is granted only the power to "enforce" by "appropriate" legislation the limitations on state action embodied in those Amendments. While the presumption of constitutionality is due to any act of a coordinate branch of the Federal Government or of one of the States, it is this Court which is ultimately responsible for deciding challenges to the exercise of power by those entities. *Marbury* v. *Madison,* 1 Cranch 137 (1803); *United States* v. *Nixon,* 418 U. S. 683 (1974). Today's decision is nothing less than a total abdication of that authority, rather than an exercise of the deference due to a coordinate branch of the government.

## I

The facts of this case readily demonstrate the fallacy underlying the Court's determination that congressional prohibition of Rome's conduct can be characterized as enforcement of the Fourteenth or Fifteenth Amendment.[1] The

---

[1] The Voting Rights Act is generally viewed as an exercise of Fifteenth Amendment power. See *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966). Since vote "dilution" devices are in issue in this case, the rights

three-judge District Court entered extensive findings of fact— facts which are conspicuously absent from the Court's opinion. The lower court found that Rome has not employed any discriminatory barriers to black voter registration in the past 17 years. Nor has the city employed any other barriers to black voting or black candidacy. Indeed, the court found that white elected officials have encouraged blacks to run for elective posts in Rome, and are "responsive to the needs and interests of the black community." The city has not discriminated against blacks in the provision of services and has made efforts to upgrade black neighborhoods.

It was also established that although a black has never been elected to political office in Rome, a black was appointed to fill a vacancy in an elective post. White candidates vigorously pursue the support of black voters. Several commissioners testified that they spent proportionately more time campaigning in the black community because they "needed that vote to win." The court concluded that "blacks often hold the balance of power in Rome elections."

Despite this political climate, the Attorney General refused to approve a number of city annexations and various changes in the electoral process. The city sought to require majority vote for election to the City Commission and Board of Education; to create numbered posts and staggered terms for those elections; and to establish a ward residency requirement for Board of Education elections. In addition, during the years

---

at stake are more properly viewed as Fourteenth Amendment rights. See *City of Mobile* v. *Bolden, ante,* p. 55. Nevertheless, this Court has upheld the constitutionality of the Act if it is applied to remedy violations of the Fourteenth Amendment. *Gaston County* v. *United States,* 395 U. S. 285, 290, n. 5 (1969). Moreover, the nature of the enforcement powers conferred by the Fourteenth and Fifteenth Amendments has always been treated as coextensive. See, *e. g., United States* v. *Guest,* 383 U. S. 745, 784 (1966) (opinion of BRENNAN, J.); *James* v. *Bowman,* 190 U. S. 127 (1903). For this reason, it is not necessary to differentiate between the Fourteenth and Fifteenth Amendment powers for the purposes of this opinion.

between 1964 and 1973, the city effected 60 annexations. Appellees concede that none of the annexations were sought for discriminatory purposes. All of the electoral changes and 13 of the annexations were opposed by the Attorney General on the grounds that their adoption would lessen the likelihood that blacks would be successful in electing a black city official, assuming racial-bloc voting on the part of both whites and blacks. Each of the changes was considered to be an impermissible "vote-dilution" device.

Rome sought judicial relief and the District Court found that the city had met its burden of proving that these electoral changes and annexations were *not* enacted with the purpose of discriminating against blacks. The changes were nevertheless prohibited because of their perceived disparate effect.[2]

## II

The Court holds today that the city of Rome can constitutionally be compelled to seek congressional approval for most of its governmental changes even though it has not engaged in any discrimination against blacks for at least 17 years. Moreover, the Court also holds that federal approval can be constitutionally denied even after the city has proved that the changes are not purposefully discriminatory. While I agree with MR. JUSTICE POWELL's conclusion that requiring localities to *submit* to preclearance is a significant intrusion on local autonomy, it is an even greater intrusion on that autonomy to *deny* preclearance sought.

The facts of this case signal the necessity for this Court to carefully scrutinize the alleged source of congressional power to intrude so deeply in the governmental structure of the municipal corporations created by some of the 50 States. Section 2 of the Fifteenth Amendment and § 5 of the Four-

---

[2] I share MR. JUSTICE POWELL's observation that the factual conclusions respecting the discriminatory effect of the annexations are highly questionable. *Ante,* at 195–196. I rest my dissent, however, on somewhat broader grounds.

teenth provide that Congress shall have the power to "enforce" § 1 "by appropriate legislation." Congressional power to prohibit the electoral changes proposed by Rome is dependent upon the scope and nature of that power. There are three theories of congressional enforcement power relevant to this case. First, it is clear that if the proposed changes would violate the Constitution, Congress could certainly prohibit their implementation. It has never been seriously maintained, however, that Congress can do no more than the judiciary to enforce the Amendments' commands. Thus, if the electoral changes in issue do not violate the Constitution, as judicially interpreted, it must be determined whether Congress could nevertheless appropriately prohibit these changes under the other two theories of congressional power. Under the second theory, Congress can act remedially to enforce the judicially established substantive prohibitions of the Amendments. If not properly remedial, the exercise of this power could be sustained only if this Court accepts the premise of the third theory that Congress has the authority under its enforcement powers to determine, without more, that electoral changes with a disparate impact on race violate the Constitution, in which case Congress by a legislative Act could effectively amend the Constitution.

I think it is apparent that neither of the first two theories for sustaining the exercise of congressional power supports this application of the Voting Rights Act. After our decision in *City of Mobile* there is little doubt that Rome has not engaged in *constitutionally* prohibited conduct.[3] I also do not

---

[3] At least four Members of the Court in *Mobile* held that purposeful discrimination would be prerequisite to establishing a constitutional violation in a case alleging vote dilution under the Fourteenth and Fifteenth Amendments. *Ante*, at 66–68 (opinion of STEWART, J.). While a majority of the Court might adopt this view, see *ante*, at 94 (opinion of WHITE, J.), the voting procedures adopted by Rome would appear to readily meet the standards of constitutionality established by MR. JUSTICE STEVENS. See *ante*, at 90.

believe that prohibition of these changes can genuinely be characterized as a remedial exercise of congressional enforcement powers. Thus, the result of the Court's holding is that Congress effectively has the power to determine for itself that this conduct violates the Constitution. This result violates previously well-established distinctions between the Judicial Branch and the Legislative or Executive Branches of the Federal Government. See *United States* v. *Nixon,* 418 U. S. 683 (1974); *Marbury* v. *Madison,* 1 Cranch 137 (1803).

## A

If the enforcement power is construed as a "remedial" grant of authority, it is this Court's duty to ensure that a challenged congressional Act does no more than "enforce" the limitations on state power established in the Fourteenth and Fifteenth Amendments. *Marbury* v. *Madison.* The Court has not resolved the question of whether it is an appropriate exercise of remedial power for Congress to prohibit local governments from instituting structural changes in their government, which although not racially motivated, will have the effect of decreasing the ability of a black voting bloc to elect a black candidate.

This Court has found, as a matter of statutory interpretation, that Congress intended to prohibit governmental changes on the basis of no more than disparate impact under the Voting Rights Act. These cases, however, have never directly presented the constitutional questions implicated by the lower court finding in this case that the city has engaged in no purposeful discrimination in enacting these changes, or otherwise, for almost two decades. See *Beer* v. *United States,* 425 U. S. 130 (1976); *City of Richmond* v. *United States,* 422 U. S. 358 (1975); *Perkins* v. *Matthews,* 400 U. S. 379 (1971); *Fairley* v. *Patterson,* decided together with *Allen* v. *State Board of Elections,* 393 U. S. 544 (1969). In none of these cases was the Court squarely presented with a constitutional challenge to congressional power to prohibit state electoral

practices after the locality has *disproved* the existence of any purposeful discrimination.[4]

The cases in which this Court has actually examined the constitutional questions relating to Congress' exercise of its powers to enforce the Fourteenth and Fifteenth Amendments also did not purport to resolve this issue.[5] But the principles which can be distilled from those precedents require the conclusion that the limitations on state power at issue cannot be sustained as a remedial exercise of power.

---

[4] In *City of Petersburg* v. *United States*, 354 F. Supp. 1021 (DC 1972), summarily aff'd, 410 U. S. 962 (1973), the District Court did find that an annexation scheme could be prohibited solely on the basis of its disparate impact, without a finding of purposeful discrimination on the part of the local government. *Petersburg* cannot be considered dispositive of the question presented in this case, however. The court did not address any possible constitutional difficulties with its conclusion, and thus it is not clear that these arguments were raised by the parties. An unexplicated summary affirmance by this Court affirms only the judgment, not the reasoning, of the District Court. See *Hicks* v. *Miranda*, 422 U. S. 332 (1975).

[5] This issue was also not squarely presented or resolved in *United Jewish Organizations* v. *Carey*, 430 U. S. 144 (1977). In *UJO*, the issue was whether the State could constitutionally take racial criteria into account in drawing its district lines where such redistricting was not strictly necessary to eliminate the effects of past discriminatory districting or apportionment. The Court found that use of these criteria was proper, for differing reasons. In an opinion by MR. JUSTICE WHITE, joined by three other Members of the Court, it was suggested in part that the Voting Rights Act could constitutionally require this. The only question, however, was the constitutionality of state use of racial criteria, vis-à-vis other citizens, and not the constitutionality of congressional Acts which required state governments to use racial criteria against their will. In another part of the opinion, MR. JUSTICE WHITE reasoned that "the State is [not] powerless to minimize the consequences of racial discrimination by voters when it is regularly practiced at the polls." *Id.*, at 167. While States may be empowered to voluntarily use racial criteria in order to minimize the effects of racial-bloc voting, that conclusion does not determine the constitutional authority of Congress to require States to use racial criteria in structuring their governments.

While the Fourteenth and Fifteenth Amendments prohibit only purposeful discrimination, the decisions of this Court have recognized that in some circumstances, congressional prohibition of state or local action which is not purposefully discriminatory may nevertheless be appropriate remedial legislation under the Civil War Amendments. See *Oregon* v. *Mitchell*, 400 U. S. 112 (1970); *Gaston County* v. *United States*, 395 U. S. 285 (1969).

Those circumstances, however, are not without judicial limits. These decisions indicate that congressional prohibition of some conduct which may not itself violate the Constitution is "appropriate" legislation "to enforce" the Civil War Amendments if that prohibition is necessary to remedy prior constitutional violations by the governmental unit, or if necessary to effectively prevent purposeful discrimination by a governmental unit. In both circumstances, Congress would still be legislating in response to the incidence of state action violative of the Civil War Amendments. These precedents are carefully formulated around a historic tenet of the law that in order to invoke a remedy, there must be a wrong— and under a remedial construction of congressional power to enforce the Fourteenth and Fifteenth Amendments, that wrong must amount to a constitutional violation. Only when the wrong is identified can the appropriateness of the remedy be measured.

The Court today identifies the constitutional wrong which was the object of this congressional exercise of power as purposeful discrimination by local governments in structuring their political processes in an effort to reduce black voting strength. The Court goes on to hold that the prohibitions imposed in this case represent an "appropriate" means of preventing such constitutional violations. The Court does not rest this conclusion on any finding that this prohibition is necessary to remedy any prior discrimination by the locality. Rather, the Court reasons that prohibition of changes dis-

criminatory in effect prevent the incidence of changes which are discriminatory in purpose:

> "Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact." *Ante,* at 177.

What the Court explicitly ignores is that in this case the city has proved that these changes are not discriminatory in purpose. Neither reason nor precedent supports the conclusion that here it is "appropriate" for Congress to attempt to prevent purposeful discrimination by prohibiting conduct which a locality proves is *not* purposeful discrimination.

Congress had before it evidence that various governments were enacting electoral changes and annexing territory to prevent the participation of blacks in local government by measures other than outright denial of the franchise.[6] Congress could of course remedy and prevent such purposeful discrimination on the part of local governments. See *Gomillion* v. *Lightfoot,* 364 U. S. 339, 347 (1960). And given the difficulties of proving that an electoral change or annexation has been undertaken for the purpose of discriminating against blacks, Congress could properly conclude that as a remedial matter it was necessary to place the burden of proving lack of discriminatory purpose on the localities. See *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966). But all of this does not support the conclusion that Congress is acting remedially when it continues the presumption of purposeful discrimination even after the locality has disproved that presumption. Absent other circumstances, it would be a topsy-turvy judicial system which held that electoral changes

---

[6] See the reference to the legislative history in *United Jewish Organizations* v. *Carey, supra,* at 158.

which have been affirmatively proved to be permissible under the Constitution nonetheless violate the Constitution.

The precedent on which the Court relies simply does not support its remedial characterization. Neither *Oregon* v. *Mitchell,* 400 U. S. 112 (1970), nor *South Carolina* v. *Katzenbach, supra,* legitimizes the use of an irrebuttable presumption that "vote-diluting" changes are motivated by a discriminatory animus. The principal electoral practice in issue in those cases was the use of literacy tests. Yet, the Court simply fails to make any inquiry as to whether the particular electoral practices in issue here are encompassed by the "preventive" remedial rationale invoked in *South Carolina* and *Oregon.* The rationale does support congressional prohibition of some electoral practices, but simply has no logical application to the "vote-dilution" devices in issue.

In *Oregon,* the Court sustained a nationwide prohibition of literacy tests, thereby extending the more limited suspension approved in *South Carolina.* By upholding this congressional measure, the Court established that under some circumstances, a congressional remedy may be constitutionally overinclusive by prohibiting some state action which might not be purposefully discriminatory. That possibility does not justify the overinclusiveness countenanced by the Court in this case, however. *Oregon* by no means held that Congress could simply use discriminatory effect as a proxy for discriminatory purpose, as the Court seems to imply. Instead, the Court opinions identified the factors which rendered this prohibition properly remedial. The Court found the nationwide ban to be an appropriate means of effectively preventing purposeful discrimination in the application of the literacy tests as well as an appropriate means of remedying prior constitutional violations by state and local governments in the administration of education to minorities.

The presumption that the literacy tests were either being used to purposefully discriminate, or that the disparate effects of those tests were attributable to discrimination in state-

administered education was not very wide of the mark. Various opinions of the Court noted that at the time that Congress enacted the ban, few States were utilizing literacy tests, 400 U. S., at 147 (opinion of Douglas, J.), and the voter registration statistics available within those States suggested that a disparate effect was prevalent. *Id.*, at 132–133 (opinion of Black, J.). Even if not adopted with a discriminatory purpose, the tests could readily be applied in a discriminatory fashion. Thus a demonstration by the State that it sought to reinstate the tests for legitimate purposes did not eliminate the substantial risk of discrimination in application. Only a ban could effectively prevent the occurrence of purposeful discrimination.

The nationwide ban was also found necessary to effectively remedy past constitutional violations. Without the nationwide ban, a voter who was illiterate due to state discrimination in education could be denied the right to vote on the basis of his illiteracy when he moved into a jurisdiction retaining a literacy test for nondiscriminatory purposes. *Id.*, at 283–284. Finally, MR. JUSTICE STEWART found that a uniform prohibition had definite advantages for enforcement and federal relations: it reduced tensions with particular regions, and it relieved the Federal Government from the administrative burden implicated by selective state enforcement.

Presumptive prohibition of vote-diluting procedures is not similarly an "appropriate" means of exacting state compliance with the Civil War Amendments. First, these prohibitions are quite unlike the literacy ban, where the disparate effects were traceable to the discrimination of governmental bodies in education even if their present desire to use the tests was legitimate. See *Gaston County* v. *United States*, 395 U. S. 285 (1969). Any disparate impact associated with the nondiscriminatory electoral changes in issue here results from bloc voting—private rather than governmental discrimi-

nation. It is clear therefore that these prohibitions do not implicate congressional power to devise an effective remedy for prior constitutional violations by local governments. Nor does the Court invoke this aspect of congressional remedial powers.

It is also clear that while most States still utilizing literacy tests may have been doing so to discriminate, a similar generalization could not be made about all government structures which have some disparate impact on black voting strength. At the time Congress passed the Act, one study demonstrated that 60% of all cities nationwide had at-large elections for city officials, for example. This form of government was adopted by many cities throughout this century as a reform measure designed to overcome wide-scale corruption in the ward system of government. See Jewell, Local Systems of Representation: Political Consequences and Judicial Choices, 36 Geo. Wash. L. Rev. 790, 799 (1967). Obviously, annexations similarly cannot be presumed to be devoid of legitimate uses. Yet both of these practices are regularly prohibited by the Act in most covered cities.

Nor does the prohibition of all practices with a disparate impact enhance congressional prevention of purposeful discrimination. The changes in issue are not, like literacy tests, though fair on their face, subject to discriminatory application by local authorities. See *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886). They are either discriminatory from the outset or not.

Finally, the advantages supporting the imposition of a nationwide ban are simply not implicated in this case. No added administrative burdens are in issue since Congress has provided the mechanism for preclearance suits in any event, and the burden of proof for this issue is on the locality. And it is certain that the only constitutional wrong implicated—purposeful dilution—can be effectively remedied by prohibiting it where it occurs. For all these reasons, I do not think

that the present case is controlled by the result in *Oregon.* By prohibiting all electoral changes with a disparate impact, Congress has attempted to prevent disparate impacts—not purposeful discrimination.

Congress unquestionably has the power to prohibit and remedy state action which intentionally deprives citizens of Fourteenth and Fifteenth Amendment rights. But unless these powers are to be wholly uncanalized, it cannot be appropriate remedial legislation for Congress to prohibit Rome from structuring its government in the manner as its population sees fit absent a finding or unrebutted presumption that Rome has been, or is, intentionally discriminating against its black citizens. Rome has simply committed no constitutional violations, as this Court has defined them.

More is at stake than sophistry at its worst in the Court's conclusion that requiring the local government to structure its political system in a manner that most effectively enhances black political strength serves to remedy or prevent constitutional wrongs on the part of the local government. The need to prevent this disparate impact is premised on the assumption that white candidates will not represent black interests, and that States should devise a system encouraging blacks to vote in a bloc for black candidates. The findings in this case alone demonstrate the tenuous nature of these assumptions. The court below expressly found that white officials have ably represented the interests of the black community. Even blacks who testified admitted no dissatisfaction, but expressed only a preference to be represented by officials of their own race. The enforcement provisions of the Civil War Amendments were not premised on the notion that Congress could empower a later generation of blacks to "get even" for wrongs inflicted on their forebears. What is now at stake in the city of Rome is the preference of the black community to be represented by a black. This Court has never elevated such a notion, by no means confined to blacks, to the status of a constitutional right. See *Whitcomb* v. *Chavis,*

403 U. S. 124 (1971). This Court concluded in *Whitcomb* that

> "[t]he mere fact that one interest group or another concerned with the outcome of . . . elections has found itself outvoted and without legislative seats of its own provides no basis for invoking constitutional remedies where, as here, there is no indication that this segment of the population is being denied access to the political system." *Id.,* at 154–155.

The Constitution imposes no obligation on local governments to erect institutional safeguards to ensure the election of a black candidate. Nor do I believe that Congress can do so, absent a finding that this obligation would be necessary to remedy constitutional violations on the part of the local government.

It is appropriate to add that even if this Court could find a remedial relationship between the prohibition of all state action with a disparate impact on black voting strength and the incidence of purposeful discrimination, this Court should exercise caution in approving the remedy in issue here absent purposeful dilution. Political theorists can readily differ on the advantages inherent in different governmental structures. As Mr. Justice Harlan noted in his dissent in *Fairley* v. *Patterson,* decided together with *Allen* v. *State Board of Elections,* 393 U. S. 544 (1969): "[I]t is not clear to me how a court would go about deciding whether an at-large system is to be preferred over a district system. Under one system, Negroes have some influence in the election of all officers; under the other, minority groups have more influence in the selection of fewer officers." *Id.,* at 586 (emphasis deleted).

### B

The result reached by the Court today can be sustained only upon the theory that Congress was empowered to determine that structural changes with a disparate impact on a minority group's ability to elect a candidate of their race

violates the Fourteenth or Fifteenth Amendment. This construction of the Fourteenth Amendment was rejected in the *Civil Rights Cases*, 109 U. S. 3 (1883). The Court emphasized that the power conferred was "remedial" only. The Court reasoned that the structure of the Amendment made it clear that it did not "authorize Congress to create a code of municipal law for the regulation of private rights; but to provide modes of redress against the operation of State laws, and the action of State officers . . . , when these are subversive of the fundamental rights specified in the [A]mendment." *Id.*, at 11. This interpretation is consonant with the legislative history surrounding the enactment of the Amendment.[7]

This construction has never been refuted by a majority of the Members of this Court. Support for this construction in current years has emerged in *South Carolina* v. *Katzenbach*, 383 U. S. 301 (1966), and *Oregon* v. *Mitchell*, 400 U. S. 112 (1970).[8] See also opinion of POWELL, J., *ante*, at 200–201. In *South Carolina* v. *Katzenbach*, the Court observed that Congress could not attack evils not comprehended by the Fifteenth Amendment. 383 U. S., at 326. In *Oregon* v. *Mitchell*, five Members of the Court were unwilling to conclude that Congress had the power to determine that estab-

---

[7] See, *e. g.*, Burt, Miranda And Title II: A Morganatic Marriage, 1969 S. Ct. Rev. 81.

[8] Explicit support can also be derived from Mr. Justice Harlan's dissenting opinion, joined by MR. JUSTICE STEWART, in *Katzenbach* v. *Morgan*, 384 U. S. 641, 659 (1966). Mr. Justice Harlan clarified the need for the remedial construction of congressional powers. It is also unnecessary, however, to read the majority opinion as establishing the Court's rejection of the remedial construction of the *Civil Rights Cases*. While MR. JUSTICE BRENNAN's majority opinion did contain language suggesting a rejection of the "remedial" construction of the enforcement powers, the opinion also advanced a remedial rationale which supports the determination reached by the Court. Compare the rationales forwarded at 384 U. S., at 654 with the statements, *id.*, at 656. It would be particularly inappropriate to construe *Katzenbach* v. *Morgan* as a rejection of the remedial interpretation of· congressional powers in view of this Court's subsequent decision in *Oregon* v. *Mitchell*.

lishing the age limitation for voting at 21 denied equal protection to those between the ages of 18 and 20.

The opinion of MR. JUSTICE STEWART in that case, joined by MR. CHIEF JUSTICE BURGER and MR. JUSTICE BLACKMUN, reaffirmed that Congress only has the power under the Fourteenth Amendment to "provide the means of eradicating situations that amount to a violation of the Equal Protection Clause" but not to "determine as a matter of substantive constitutional law what situations fall within the ambit of the clause." *Id.*, at 296. Mr. Justice Harlan, in a separate opinion, reiterated his belief that it is the duty of the Court, and not the Congress, to determine when States have exceeded constitutional limitations imposed upon their powers. *Id.*, at 204–207. Cf. *Oregon* v. *Hass,* 420 U. S. 714 (1975); *Cooper* v. *Aaron,* 358 U. S. 1, 18 (1958). Mr. Justice Black also was unwilling to accept the broad construction of enforcement powers formulated in the opinion of MR. JUSTICE BRENNAN, joined by JUSTICES WHITE and MARSHALL.[9]

The Court today fails to heed this prior precedent. To permit congressional power to prohibit the conduct challenged in this case requires state and local governments to cede far more of their powers to the Federal Government than the Civil War Amendments ever envisioned; and it requires the judiciary to cede far more of its power to interpret and enforce the Constitution than ever envisioned. The intrusion is all the more offensive to our constitutional system when it is recognized that the only values fostered are debatable assumptions about political theory which should properly be left to the local democratic process.

---

[9] Since Mr. Justice Black found that congressional powers were more circumscribed when not acting to counter racial discrimination under the Fourteenth Amendment, he did not have to determine the precise nature of congressional powers when they were exercised in the field of racial relations. His analysis of the nationwide ban on literacy tests, also presented in *Oregon* v. *Mitchell,* however, is consistent with a remedial interpretation of those powers.