*212 Justice Thomas,
concurring in the judgment in part and dissenting in part.
This appeal presents two questions: first, whether appellant is entitled to bail out from coverage under the Voting Rights Act of 1965 (VRA); and second, whether the preclearance requirement of § 5 of the VRA is unconstitutional. Because the Court’s statutory decision does not provide appellant with full relief, I conclude that it is inappropriate to apply the constitutional avoidance doctrine in this case. I would therefore decide the constitutional issue presented and hold that § 5 exceeds Congress’ power to enforce the Fifteenth Amendment.
I
The doctrine of constitutional avoidance factors heavily in the Court’s conclusion that appellant is eligible for bailout as a “political subdivision” under § 4(a) of the VRA. See ante, at 206-207.' Regardless of the Court’s resolution of the statutory question, I am in full agreement that this case raises serious questions concerning the constitutionality of §5 of the VRA. But, unlike the Court, I do not believe that the doctrine of constitutional avoidance is applicable here. The ultimate relief sought in this case is not bailout eligibility— it is bailout itself. See First Amended Complaint in No. 06-1384 (DDC), p. 8, Record, Doc. 83 (“Plaintiff requests the Court to declare that the district has met the bail-out requirements of § 4 of the [VRA] and that the preclearance requirements of §5 ... no longer apply to the district; or, in the alternative, that § 5 of the Act as applied to the district is an unconstitutional overextension of Congress’s enforcement power to remedy past violations of the Fifteenth Amendment”).
Eligibility for bailout turns on the statutory question addressed by the Court — the proper definition of “political subdivision” in the bailout clauses of § 4(a) of the VRA. Entitlement to bailout, however, requires a covered “political subdivision” to submit substantial evidence indicating that *213 it is not engaging in “discrimination in voting on account of race,” see 42 U. S. C. § 1973b(a)(3). The Court properly declines to give appellant bailout because appellant has not yet proved its compliance with the statutory requirements for such relief. See §§ 1973b(a)(l)-(3). In fact, the record below shows that appellant’s factual entitlement to bailout is a vigorously contested issue. See, e. g., NAACP’s Statement of Undisputed Material Facts in No. 06-1384 (DDC), pp. 490-492, Record, Doc. 100; Attorney General’s Statement of Uncontested Material Facts in No. 06-1384 (DDC), ¶¶ 19, 59, Record, Doc. 98. Given its resolution of the statutory question, the Court has thus correctly remanded the case for resolution of appellant’s factual entitlement to bailout. See ante, at 211.
But because the Court is not in a position to award appellant bailout, adjudication of the constitutionality of §5, in my view, cannot be avoided. “Traditionally, the avoidance canon was not a doctrine under which courts read statutes to avoid mere constitutional doubts. Instead, it commanded courts, when faced with two plausible constructions of a statute — one constitutional and the other unconstitutional — to choose the constitutional reading.” Clark v. Martinez, 543 U. S. 371, 395 (2005) (Thomas, J., dissenting). To the extent that constitutional avoidance is a worthwhile tool of statutory construction, it is because it allows a court to dispose of an entire case on grounds that do not require the court to pass on a statute’s constitutionality. See Ashwander v. TVA, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring) (“The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of”); see also, e. g., Mayor of Philadelphia v. Educational Equality League, 415 U. S. 605, 629 (1974). The doctrine “avoids decision of constitutional questions where possible, and it permits one lawsuit, rather than two, to resolve the entire controversy.” C. Wright, The Law of Fed *214 eral Courts § 19, p. 104 (4th ed. 1983). Absent a determination that appellant is not just eligible for bailout, but is entitled to it, this case will not have been entirely disposed of on a nonconstitutional ground. Cf. Tr. of Oral Arg. 14 (“[I]f the Court were to give us bailout.. . the Court might choose on its own not to reach the constitutional issues because we would receive relief”). Invocation of the doctrine of constitutional avoidance is therefore inappropriate in this case.
The doctrine of constitutional avoidance is also unavailable here because an interpretation of §4(a) that merely makes more political subdivisions eligible for bailout does not render § 5 constitutional, and the Court notably does not suggest otherwise. See Clark, supra, at 396 (Thomas, J., dissenting). Bailout eligibility is a distant prospect for most covered jurisdictions. To obtain bailout a covered jurisdiction must satisfy numerous objective criteria. It must show that during the previous 10 years: (A) no “test or device has been used within such State or political subdivision for the purpose or with the effect of denying or abridging the right to vote on account of race or color”; (B) “no final judgment of any court of the United States ... has determined that denials or abridgements of the right to vote on account of race or color have occurred anywhere in the territory of” the covered jurisdiction; (C) “no Federal examiners or observers .. . have been assigned to” the covered jurisdiction; (D) the covered jurisdiction has fully complied with § 5; and (E) “the Attorney General has not interposed any objection (that has not been overturned by a final judgment of a court) and no declaratory judgment has been denied under [§ 5].” §§ 1973b(a)(l)(A)-(E). The jurisdiction also has the burden of presenting “evidence of minority participation, including evidence of the levels of minority group registration and voting, changes in such levels over time, and disparities between minority-group and non-minority-group participation.” § 1973b(a)(2).
*215 These extensive requirements may be difficult to satisfy, see Brief for Georgia Governor Sonny Perdue as Amicus Curiae 20-26, but at least they are objective. The covered jurisdiction seeking bailout must also meet subjective criteria: It must “(i) have eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process; (ii) have engaged in constructive efforts to eliminate intimidation and harassment of persons exercising rights protected [under the Act]; and (iii) have engaged in other constructive efforts, such as expanded opportunity for convenient registration and voting for every person of voting age and the appointment of minority persons as election officials throughout the jurisdiction and at all stages of the election and registration process.” §§ 1973b(a)(l)(F)(i)-(iii).
As a result, a covered jurisdiction meeting each of the objective conditions could nonetheless be denied bailout because it has not, in the subjective view of the United States District Court for the District of Columbia, engaged in sufficiently “constructive efforts” to expand voting opportunities, § 1973b(a)(l)(F)(iii). Congress, of course, has complete authority to set the terms of bailout. But its promise of a bailout opportunity has, in the great majority of cases, turned out to be no more than a mirage. As the Court notes, only a handful “of the more than 12,000 covered political subdivisions ... have successfully bailed out of the Act.” Ante, at 211;[1] see Williamson, The 1982 Amendments to the Voting Rights Act: A Statutory Analysis of the Revised Bailout Provisions, 62 Wash. U. L. Q. 1,42 (1984) (explaining that *216 “the conditions for termination of coverage have been made so restrictive that bailout will continue to be impossible for most jurisdictions”). Accordingly, bailout eligibility does not eliminate the issue of §5’s constitutionality.
II
The Court quite properly alerts Congress that § 5 tests the outer boundaries of its Fifteenth Amendment enforcement authority and may not be constitutional. See ante, at 202-204. And, although I respect the Court’s careful approach to this weighty issue, I nevertheless believe it is necessary to definitively resolve that important question. For the reasons set forth below, I conclude that the lack of current evidence of intentional discrimination with respect to voting renders § 5 unconstitutional. The provision can no longer be justified as an appropriate mechanism for enforcement of the Fifteenth Amendment.
A
“The government of the United States is one of delegated powers alone. Its authority is defined and limited by the Constitution. All powers not granted to it by that instrument are reserved to the States or the people.” United States v. Cruikshank, 92 U. S. 542, 551 (1876); see also U. S. Term Limits, Inc. v. Thornton, 514 U. S. 779, 848 (1995) (Thomas, J., dissenting). In the specific area of voting rights, this Court has consistently recognized that the Constitution gives the States primary authority over the structuring of electoral systems. See, e. g., White v. Weiser, 412 U. S. 783, 795 (1973); Burns v. Richardson, 384 U. S. 73, 84-85 (1966). “No function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices.” Oregon v. Mitchell, 400 U. S. 112, 125 (1970) (opinion of Black, J.).
*217 State autonomy with respect to the machinery of self-government defines the States as sovereign entities rather than mere provincial outposts subject to every dictate of a central governing authority. See U. S. Const., Amdt. 10 (“The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people”); see also Alden v. Maine, 527 U. S. 706, 713 (1999). In the main, the “Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.” Gregory v. Ashcroft, 501 U. S. 452, 461-462 (1991) (internal quotation marks omitted).
To be sure, state authority over local elections is not absolute under the Constitution. The Fifteenth Amendment guarantees that the “right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude,” §1, and it grants Congress the authority to “enforce” these rights “by appropriate legislation,” §2. The Fifteenth Amendment thus renders unconstitutional any federal or state law that would limit a citizen’s access to the ballot on one of the three bases enumerated in the Amendment. See Mobile v. Bolden, 446 U. S. 55, 65 (1980) (plurality opinion) (the Fifteenth Amendment guards against “purposefully discriminatory denial or abridgment by government of the freedom to vote”). Nonetheless, because States still retain sovereign authority over their election systems, any measure enacted in furtherance of the Fifteenth Amendment must be closely examined to ensure that its encroachment on state authority in this area is limited to the appropriate enforcement of this ban on discrimination.
There is certainly no question that the VRA initially “was passed pursuant to Congress’ authority under the Fifteenth Amendment.” Lopez v. Monterey County, 525 U. S. 266, 282 (1999). For example, §§2 and 4(a) seek to implement the Fifteenth Amendment’s substantive command by creating a *218 private cause of action to enforce § 1 of the Fifteenth Amendment, see § 1973(a), and by banning discriminatory tests and devices in covered jurisdictions, see § 1973b(a); see also City of Lockhart v. United States, 460 U. S. 125, 139 (1983) (Marshall, J., concurring in part and dissenting in part) (explaining that §2 reflects Congress’ determination “that voting discrimination was a nationwide problem” that called for a “general prohibition of discriminatory practices”). Other provisions of the VRA also directly enforce the Fifteenth Amendment. See § 1973h (elimination of poll taxes that effectively deny certain racial groups the right to vote); § 1973i(a) (“No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote ... or willfully fail or refuse to tabulate, count, and report such person’s vote”).
Section 5, however, was enacted for a different purpose: to prevent covered jurisdictions from circumventing the direct prohibitions imposed by provisions such as §§2 and 4(a). See Reno v. Bossier Parish School Bd., 520 U. S. 471, 477 (1997) (explaining that §§2 and 5 “combat different evils” and “impose very different duties upon the States”). Section 5 “was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down. That practice had been possible because each new law remained in effect until the Justice Department or private plaintiffs were able to sustain the burden of proving that the new law, too, was discriminatory.” Beer v. United States, 425 U. S. 130, 140 (1976) (internal quotation marks omitted).
The rebellion against the enfranchisement of blacks in the wake of ratification of the Fifteenth Amendment illustrated the need for increased federal intervention to protect the right to vote. Almost immediately following Reconstruction, blacks attempting to vote were met with coordinated *219 intimidation and violence. See, e. g., L. McDonald, A Voting Rights Odyssey: Black Enfranchisement in Georgia 34 (2003) (“By 1872, the legislative and executive branches of state government . . . were once again firmly in the control of white Democrats, who resorted to a variety of tactics, including fraud, intimidation, and violence, to take away the vote from blacks, despite ratification of the Fifteenth Amendment in 1870 . . . ”).[2] A soon-to-be victorious mayoral candidate in Wilmington, North Carolina, for example, urged white voters in an 1898 election-eve speech: “'Go to the polls tomorrow and if you find the negro out voting, tell him to leave the polls, and if he refuses kill him; shoot him down in his tracks.’” S. Tolnay & E. Beck, A Festival of Violence: An Analysis of Southern Lynchings, 1882-1930, p. 67 (1995).
This campaign of violence eventually was supplemented, and in part replaced, by more subtle methods engineered to deny blacks the right to vote. See South Carolina v. Katzenbach, 383 U. S. 301, 310-312 (1966). Literacy tests were particularly effective: “[A]s of 1890 in ... States [with literacy tests], more than two-thirds of the adult Negroes were illiterate while less than one-quarter of the adult whites were unable to read or write,” id., at 311, because “[p]rior to the Civil War, most of the slave States made it a crime to *220 teach Negroes how to read or write,” see also ibid., n. 10.[3] Compounding the tests’ discriminatory impact on blacks, alternative voter qualification laws such as “grandfather clauses, property qualifications, [and] ‘good character’ tests” were enacted to protect those whites who were unable to pass the literacy tests. Id., at 311; see also Lopez, 525 U. S., at 297 (Thomas, J., dissenting) (“Literacy tests were unfairly administered; whites were given easy questions, and blacks were given more difficult questions, such as the number of bubbles in a soap bar, the news contained in a copy of the Peking Daily, the meaning of obscure passages in state constitutions, and the definition of terms such as habeas corpus” (internal quotation marks omitted)).
The Court had declared many of these “tests and devices” unconstitutional, see Katzenbach, 383 U. S., at 311-312, but case-by-case eradication was woefully inadequate to ensure that the franchise extended to all citizens regardless of race, see id., at 328. As a result, enforcement efforts before the enactment of § 5 had rendered the right to vote illusory for blacks in the Jim Crow South. Despite the Civil War’s bloody purchase of the Fifteenth Amendment, “the reality remained far from the promise.” Rice v. Cayetano, 528 U. S. 495, 512-513 (2000); see also R. Wardlaw, Negro Suffrage in Georgia, 1867-1930, p. 34 (Phelps-Stokes Fellowship Stud *221 ies, No. 11, Sept. 1932) (“Southern States were setting out to accomplish an effectual nullification of the war measures of Congress”).
Thus, by 1965, Congress had every reason to conclude that States with a history of disenfranchising voters' based on race would continue to do all they could to evade the constitutional ban on voting discrimination. By that time, race-based voting discrimination had “infected the electoral process in parts of our country for nearly a century.” Katzenbach, 383 U. S., at 308. Moreover, the massive scale of disenfranchisement efforts made case-by-case enforcement of the Fifteenth Amendment impossible, if not Sisyphean. See id., at 309 (“Congress concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment”); Rice, supra, at 513 (“Progress was slow, particularly when litigation had to proceed case by case, district by district, sometimes voter by voter”); Thernstrom, Section 5 of the Voting Rights Act: By Now, a Murky Mess, 5 Geo. J. L. & Pub. Pol’y 41, 44 (2007) (“In 1965, it was perfectly reasonable to believe that any move affecting black enfranchisement in the Deep South was deeply suspect. And only such a punitive measure [as § 5] had any hope of forcing the South to let blacks vote” (emphasis in original)).
It was against this backdrop of “historical experience” that § 5 was first enacted and upheld against a constitutional challenge. See Katzenbach, supra, at 308. As the Katzenbach Court explained, § 5, which applied to those States and political subdivisions that had employed discriminatory tests and devices in the previous Presidential election, see 42 U. S. C. § 1973b(b), directly targeted the “insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution.” 383 U. S., at 309; see also id., at 329 (“Congress began work with reliable evidence of actual vot *222 ing discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act”). According to the Court, it was appropriate to radically interfere with control over local elections only in those jurisdictions with a history of discriminatory disenfranchisement as those were “the geographic areas where immediate action seemed necessary.” Id., at 328. The Court believed it was thus “permissible to impose the new remedies” on the jurisdictions covered under § 4(b) “at least in the absence of proof that they ha[d] been free of substantial voting discrimination in recent years.” Id., at 330.
In upholding §5 in Katzenbach, the Court nonetheless noted that the provision was an “uncommon exercise of congressional power” that would not have been “appropriate” absent the “exceptional conditions” and “unique circumstances” present in the targeted jurisdictions at that particular time. Id., at 334-335. In reaching its decision, the . Court thus refused to simply accept Congress’ representation that the extreme measure was necessary to enforce the Fifteenth Amendment; rather, it closely reviewed the record compiled by Congress to ensure that § 5 was “ 'appropriate’ ” antievasion legislation. See id., at 308. In so doing, the Court highlighted evidence showing that black voter registration rates ran approximately 50 percentage points lower than white voter registration in several States. See id., at 313. It also noted that the registration rate for blacks in Alabama “rose only from 14.2% to 19.4% between 1958 and 1964; in Louisiana it barely inched ahead from 31.7% to 31.8% between 1956 and 1965; and in Mississippi it increased only from 4.4% to 6.4% between 1954 and 1964.” Ibid. The Court further observed that voter turnout levels in covered jurisdictions had been at least 12% below the national average in the 1964 Presidential election. See id., at 329-330.
The statistical evidence confirmed Congress’ judgment that “the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting *223 discrimination in the face of adverse federal court decrees” was working and could not be defeated through ease-by-case enforcement of the Fifteenth Amendment. Id., at 335. This record also clearly supported Congress’ predictive judgment that such “States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself.” Ibid. These stark statistics — in conjunction with the unrelenting use of discriminatory tests and practices that denied blacks the right to vote — constituted sufficient proof of “actual voting discrimination” to uphold the preclearance requirement imposed by § 5 on the covered jurisdictions as an appropriate exercise of congressional power under the Fifteenth Amendment. Id., at 330. It was only “[u]nder the compulsion of these unique circumstances [that] Congress responded in a permissibly decisive manner.” Id., at 335.
B
Several important principles emerge from Katzenbach and the decisions that followed it. First, § 5 prohibits more state voting practices than those necessarily encompassed by the explicit prohibition on intentional discrimination found in the text of the Fifteenth Amendment. The explicit command of the Fifteenth Amendment is a prohibition on state practices that in fact deny individuals the right to vote “on account of” race, color, or previous servitude. In contrast, § 5 is the quintessential prophylaxis; it “goes beyond the prohibition of the Fifteenth Amendment by suspending all changes to state election law — however innocuous — until they have been precleared by federal authorities in Washington, D. C.” Ante, at 202. The Court has freely acknowledged that such legislation is preventative, upholding it based on the view that the Reconstruction Amendments give Congress the power “both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the *224 Amendment’s text.” Kimel v. Florida Bd. of Regents, 528 U. S. 62, 81 (2000) (emphasis added).
Second, because it sweeps more broadly than the substantive command of the Fifteenth Amendment, §5 pushes the outer boundaries of Congress’ Fifteenth Amendment enforcement authority. See Miller v. Johnson, 515 U. S. 900, 926 (1995) (detailing the “federalism costs exacted by § 5”); Presley v. Etowah County Comm’n, 502 U. S. 491, 500-501 (1992) (describing §5 as “an extraordinary departure from the traditional course of relations between the States and the Federal Government”); City of Rome v. United States, 446 U. S. 156, 200 (1980) (Powell, J., dissenting) (“The preclearance requirement both intrudes on the prerogatives of state and local governments and abridges the voting rights of all citizens in States covered under the Act”); Lopez, 525 U. S., at 293 (Thomas, J., dissenting) (“Section 5 is a unique requirement that exacts significant federalism costs”); ante, at 202 (“[Section] 5, which authorizes federal intrusion into sensitive areas of state and local policymaking, imposes substantial federalism costs” (internal quotation marks omitted)).
Indeed, § 5’s preclearance requirement is “one of the most extraordinary remedial provisions in an Act noted for its broad remedies. Even the Department of Justice has described it as a ‘substantial departure .. . from ordinary concepts of our federal system’; its encroachment on state sovereignty is significant and undeniable.” United States v. Sheffield Bd. of Comm’rs, 435 U. S. 110, 141 (1978) (Stevens, J., dissenting) (footnote omitted). This “encroachment is especially troubling because it destroys local control of the means of self-government, one of the central values of our polity.” City of Rome, supra, at 201 (Powell, J., dissenting). More than 40 years after its enactment, this intrusion has become increasingly difficult to justify.
Third, to accommodate the tension between the constitutional imperatives of the Fifteenth and Tenth Amendments — a balance between allowing the Federal Govern *225 ment to patrol state voting practices for discrimination and preserving the States’ significant interest in self-determination — the constitutionality of §5 has always depended on the proven existence of intentional discrimination so extensive that elimination of it through case-by-case enforcement would be impossible. See Katzenbach, 383 U. S., at 308 (“Before enacting the measure, Congress explored with great care the problem of racial discrimination in voting”); Katzenbach v. Morgan, 384 U. S. 641, 667 (1966) (Harlan, J., dissenting) (“Congress made a detailed investigation of various state practices that had been used to deprive Negroes of the franchise”). “There can be no remedy without a wrong. Essential to our holdings in [South Carolina v.] Katzenbach and City of Rome was our conclusion that Congress was remedying the effects of prior intentional racial discrimination. In both cases, we required. Congress to have some evidence that the jurisdiction burdened with preclearance obligations had actually engaged in such intentional discrimination.” Lopez, supra, at 294-295 (Thomas, J., dissenting) (emphasis in original).
The Court has never deviated from this understanding. We have explained that prophylactic legislation designed to enforce the Reconstruction Amendments must “identify conduct transgressing the . . . substantive provisions” it seeks to enforce and be tailored “to remedying or preventing such conduct.” Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank, 527 U. S. 627, 639 (1999). Congress must establish a “history and pattern” of constitutional violations to establish the need for § 5 by justifying a remedy that pushes the limits of its constitutional authority. Board of Trustees of Univ. of Ala. v. Garrett, 531 U. S. 356, 368 (2001). As a result, for § 5 to withstand renewed constitutional scrutiny, there must be a demonstrated connection between the “remedial measures” chosen and the “evil presented” in the record made by Congress when it renewed the VRA. City of Boerne v. Flores, 521 U. S. 507, 530 (1997). *226 “Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one.” Ibid.
C
The extensive pattern of discrimination that led the Court to previously uphold § 5 as enforcing the Fifteenth Amendment no longer exists. Covered jurisdictions are not now engaged in a systematic campaign to deny black citizens access to the ballot through intimidation and violence. And the days of “grandfather clauses, property qualifications, ‘good character’ tests, and the requirement that registrants ‘understand’ or ‘interpret’ certain matter,” Katzenbach, 383 U. S., at 311, are gone. There is thus currently no concerted effort in these jurisdictions to engage in the “unremitting and ingenious defiance of the Constitution,” id., at 309, that served as the constitutional basis for upholding the “uncommon exercise of congressional power” embodied in §5, id., at 334.
The lack of sufficient evidence that the covered jurisdictions currently engage in the type of discrimination that underlay the enactment of § 5 undermines any basis for retaining it. Punishment for long past sins is not a legitimate basis for imposing a forward-looking preventative measure that has already served its purpose. Those supporting § 5’s reenactment argue that without it these jurisdictions would return to the racially discriminatory practices of 30 and 40 years ago. But there is no evidence that public officials stand ready, if given the chance, to again engage in concerted acts of violence, terror, and subterfuge in order to keep minorities from voting. Without such evidence, the charge can only be premised on outdated assumptions about racial attitudes in the covered jurisdictions. Admitting that a prophylactic law as broad as § 5 is no longer constitutionally justified based on current evidence of discrimination is not a sign of defeat. It is an acknowledgment of victory.
*227 The current statistical evidence confirms that the emergency that prompted the enactment of §5 has long since passed. By 2006, the voter registration rates for blacks in Alabama, Louisiana, and Mississippi had jumped to 71.8%, 66.9%, and 72.2%, respectively. See App. to Brief for Southeastern Legal Foundation as Amicus Curiae 6a-7a (hereinafter SLF Brief). Therefore, in contrast to the Katzenbach Court’s finding that the “registration of voting-age whites ran roughly 50 percentage points or more ahead of Negro registration” in these States in 1964, see 383 U. S., at 313, since that time this disparity has nearly vanished. In 2006, the disparity was only 3 percentage points in Alabama, 8 percentage points in Louisiana, and in Mississippi, black voter registration actually exceeded white voter registration by 1.5 percentage points. See App. to SLF Brief 6a-7a. In addition, blacks in these three covered States also have higher registration numbers than the registration rate for whites in noncovered states. See E. Blum & L. Campbell, Assessment of Voting Rights Progress in Jurisdictions Covered Under Section Five of the Voting Rights Act 3-6 (Am. Enterprise Inst. 2006); see also S. Rep. No. 109-295, p. 11 (2006) (noting that “presently in seven of the covered States, African-Americans are registered at a rate higher than the national average”; in two more, black registration in the 2004 election was “identical to the national average”; and in “California, Georgia, Mississippi, North Carolina, and Texas, black registration and turnout in the 2004 election .. . was higher than that for whites”).
Indeed, when reenacting §5 in 2006, Congress evidently understood that the emergency conditions which prompted §5’s original enactment no longer exist. See H. R. Rep. No. 109-478, p. 12 (2006) (“The record reveals that many of the first generation barriers to minority voter registration and voter turnout that were in place prior to the VRA have been eliminated”). Instead of relying on the kind of evi *228 dence that the Katzenbach Court had found so persuasive, Congress based reenactment on evidence of what it termed “second generation barriers constructed to prevent minority voters from fully participating in the electoral process.” § 2(b)(2), 120 Stat. 577. But such evidence is not probative of the type of purposeful discrimination that prompted Congress to enact §5 in 1965. For example, Congress relied upon evidence of racially polarized voting within the covered jurisdictions. But racially polarized voting is not evidence of unconstitutional discrimination, see Bolden, 446 U. S. 55, is not state action, see James v. Bowman, 190 U. S. 127, 136 (1903), and is not a problem unique to the South, see Katz, Aisenbrey, Baldwin, Cheuse, & Weisbrodt, Documenting Discrimination in Voting: Judicial Findings Under Section 2 of The Voting Rights Act Since 1982, 39 U. Mich. J. L. Reform 643, 665 (2006). The other evidence relied on by Congress,. such as §5 enforcement actions, §§2 and 4 lawsuits, and federal examiner and observer coverage, also bears no resemblance to the record initially supporting §5, and is plainly insufficient to sustain such an extraordinary remedy. See SLF Brief 18-35. In sum, evidence of “second generation barriers” cannot compare to the prevalent and pervasive voting discrimination of the 1960’s.
This is not to say that voter discrimination is extinct. Indeed, the District Court singled out a handful of examples of allegedly discriminatory voting practices from the record made by Congress. See, e. g., Northwest Austin Municipal Util. Dist. No. One v. Mukasey, 573 F. Supp. 2d 221, 252-254, 256-262 (DC 2008). But the existence of discrete and isolated incidents of interference with the right to vote has never been sufficient justification for the imposition of § 5’s extraordinary requirements. From its inception, the statute was promoted as a measure needed to neutralize a coordinated and unrelenting campaign to deny an entire race access to the ballot. See City of Boerne, 521 U. S., at 526 (concluding that Katzenbach confronted a “widespread and *229 persisting deprivation of constitutional rights resulting from this country’s history of racial discrimination”). Perfect compliance with the Fifteenth Amendment’s substantive command is not now — nor has it ever been — the yardstick for determining whether Congress has the power to employ broad prophylactic legislation to enforce that Amendment. The burden remains with Congress to prove that the extreme circumstances warranting §5’s enactment persist today. A record of scattered infringement of the right to vote is not a constitutionally acceptable substitute.
* * *
In 1870, the Fifteenth Amendment was ratified in order to guarantee that no citizen would be denied the right to vote based on race, color, or previous condition of servitude. Congress passed § 5 of the VRA in 1965 because that promise had remained unfulfilled for far too long. But now — more than 40 years later — the violence, intimidation, and subterfuge that led Congress to pass § 5 and this Court to uphold it no longer remains. An acknowledgment of §5’s unconstitutionality represents a fulfillment of the Fifteenth Amendment’s promise of full enfranchisement and honors the success achieved by the VRA.

All 17 covered jurisdictions that have been awarded bailout are from "Virginia, see App. to Brief for Jurisdictions That Have Bailed Out as Amici Curiae 3, and all 17 were represented by the same attorney — a former lawyer in the Voting Rights Section of the Department of Justice, see Hebert, An Assessment of the Bailout Provisions of the Voting Rights Act, in Voting Rights Act Reauthorization of 2006, p. 257, n. 1 (A. Henderson ed. 2007). Whatever the reason for this anomaly, it only underscores how little relationship there is between the existence of bailout and the constitutionality of § 5.

 See also S. Rep. No. 41, 42d Cong., 2d Sess., pt. 7, p. 610 (1872) (quoting a Ku Klux Klan letter warning a black man from Georgia to “‘stay at home if you value your life, and not vote at all, and advise all of your race to do the same thing. You are marked and closely watched by K. K. K. ... ’ ”); see also Jackson Daily Mississippian, Dec. 29, 1887, reprinted in S. Misc. Doc. No. 166, 50th Cong., 1st Sess., 14 (1888) (“[W]e hereby warn the negroes that if any one of their race attempts to run for office in the approaching municipal election he does so at his supremest peril, and we further warn any and all negroes of this city against attempting, at their utmost hazard, by vote or influence, to foist on us again this black and damnable machine miscalled a government of our city” (publishing resolutions passed by the Young White Men’s League of Jackson)).

 Although tests had become the main tool for disenfranchising blacks, state governments engaged in violence into 1965. See Daniel, Tear Gas, Clubs Halt 600 in Selma March, Washington Times Herald, Mar. 8, 1965, pp. A1, A3 (“State troopers and mounted deputies bombarded 600 praying Negroes with tear gas today and then waded into them with clubs, whips and ropes, injuring scores.... The Negroes started out today to walk the 50 miles to Montgomery to protest to [Governor] Wallace the denial of Negro voting rights in Alabama”); Banner, Aid for Selma Negroes, N. Y. Times, Mar. 14, 1965, p. Ell (“We should remember March 7, 1965 as ‘Bloody Sunday in Selma.’ It is now clear that the public officials and the police of Alabama are at war with those citizens who are Negroes and who are determined to exercise their rights under the Constitution of the United States”).